944 A.2d 599

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. CARLOS FEAL, DEFENDANT–RESPONDENT.

Argued January 23, 2008—Decided April 8, 2008.

 

*Sara B. Liebman,* Assistant Prosecutor, argued the cause for appellant (*Theodore J. Romankow,* Union County Prosecutor, attorney; *Ms. Liebman* and *Steven J. Kaflowitz,* Assistant Prosecutor, on the briefs).

*Frank J. Pugliese,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice LONG delivered the opinion of the Court.

In *State v. Daniels*, exercising our supervisory role over the administration of criminal justice, we issued a blanket prohibition against a prosecutor's "drawing the jury's attention to defendant's presence during trial and his concomitant opportunity to tailor his testimony" during summation. 182 *N.J.* 80, 98, 861 *A.*2d 808 (2004) (citing *Portuondo v. Agard*, 529 *U.S.* 61, 70–71, 120 *S.Ct.* 1119, 1126, 146 *L.Ed.*2d 47, 57 (2000)). We further stated that "*at no time* during cross-examination may the prosecutor reference the defendant's attendance at trial or his ability to hear the testimony of preceding witnesses." *Id.* at 99, 861 *A.*2d 808 (emphasis added). We applied that bright-line rule "even when the record indicates that defendant tailored his testimony." *Id.* at 101, 861 *A.*2d 808. In the present case, during cross-examination and on summation, the prosecutor accused defendant of tailoring his testimony based on his review of pre-trial discovery and on his ability to "observe all the witness[es] that the State presented come in and testify in this case."

Defendant appealed, and relying on *Daniels*, the Appellate Division reversed on the ground that the prosecutor improperly commented on defendant's presence during trial as a tailoring opportunity. Because defendant's trial preceded *Daniels*, we are faced here with an issue of retroactivity. We now hold that *Daniels* is entitled to pipeline retroactivity but that, in this case, the *Daniels* violation does not warrant reversal of defendant's convictions.

I

A Union County grand jury charged defendant Carlos Feal with (1) first-degree murder in violation of *N.J.S.A.* 2C:11–3(a)(1); (2) second-degree possession of a weapon for an unlawful purpose in violation of *N.J.S.A.* 2C:39–4(a); and (3) third-degree unlawful possession of a weapon in violation of *N.J.S.A.* 2C:39–5(b).

At trial, the State adduced the following evidence. In October 2000, defendant was living with his girlfriend, Julia Torres, in an

apartment at 220 Third Street in Elizabeth, New Jersey. Torres's daughter Carmen testified that defendant owned a revolver, which was kept in the master bedroom in the nightstand. According to Carmen, the couple had a "tense" relationship. On several occasions, Carmen overheard defendant threaten to kill or injure Torres if she ever left him. Carmen did not take the threats seriously.

On October 30, 2000, Carmen and her two-year-old daughter spent the day at her mother's apartment. At some point during the afternoon, Torres discovered that the child had taken one of defendant's two guns from the nightstand in the bedroom. Defendant then took both guns and placed them on the top shelf of the bedroom closet out of the child's reach. Carmen and her daughter left the apartment around 11:30 p.m.

At approximately 7:30 a.m. on October 31, 2000, the neighbors in the apartment complex heard a gunshot. About fifteen minutes later, they observed defendant walk out of the building with a supermarket bag in hand. A neighbor called 911, and when emergency medical technicians arrived, they pronounced Torres dead at the scene.

Defendant fled New Jersey after Torres's death, traveling to Texas, Florida, and eventually New York under an assumed name. Seven months after Torres's death, the police received information that defendant was in New York City. Detectives Kenney and Olivero, of the Elizabeth Police Department, and two New York City detectives arrested defendant in Manhattan.

Defendant's initial statement[1] to the police was read into the record at trial by Detective Olivero, as follows:

---

[1] At the time of his arrest, defendant primarily spoke Spanish and understood little English. During questioning, Detective Olivero, who is fluent in Spanish, served as the interpreter. Detective Olivero issued *Miranda* warnings and provided defendant with a waiver of rights form, written in both Spanish and English. Defendant indicated verbally and in writing that he understood the warnings and forms. Then, Detective Kenney, with the help of Detective Olivero, took defendant's sworn statement.

I arrived home about 7 in the morning and [Torres] started to fight with me and pull on my pullover saying that I smell like perfume and that I had a hickey on my neck. She then started to hit me with the broomstick, so I went to the bedroom and went to the draw[er] where I kept the gun, took it out and put it on the kitchen counter by the sink. I then told her that if she hits me again that I was either going to hit her over the head with the gun or shoot her. I put it down and she went to grab it. As she grabbed it, I took it from her and told her to stop hitting me with the stick. And as I was pointing the gun at her, the gun just went off, and I shot her in the left shoulder and she fell down.

Question: What did you do after you shot her and she fell down?

Answer: She started to talk to me. She said you killed me. I told her that I would call for help and she said what for you already killed me.

After that I grabbed a pair of jeans, socks, and my sneakers and left.

Question: Did you speak to anybody as you were leaving the building?

Answer: [A neighbor] opened the door and I said to him I think I killed [Torres] ... and I left.

Defendant also stated that he disposed of a .38 revolver on a grass median on Route 278.

A medical expert produced by the State testified that, in addition to the gunshot wound, Torres had a fresh contusion on the left parietal region of the scalp caused by blunt force, possibly from the butt of a gun. Also, the police could not locate any photographs of defendant in the apartment, although Carmen indicated that there were always photographs of defendant and Torres in the master bedroom.

Defendant testified on his own behalf. That testimony was at odds with his prior statement in numerous respects. Notably, defendant said that he saw Torres eyeing the nightstand in which the gun was located and as a result took the gun and stored it behind a canister on the kitchen counter. Defendant then portrayed Torres as an armed aggressor and stated that she took the gun from where he had hidden it and came at him "with the pistol in her hand ... with the pistol facing the floor." Fearing that Torres would use the gun against him, defendant stated that he attempted to take it away from her. According to defendant, in the ensuing struggle, the gun accidentally went off.

During cross-examination, the prosecutor pointed out those inconsistencies in detail:

Q. [Prosecutor]: Now you testified the other day that you went and got the gun because you saw Julia looking at that night stand, correct?

A. [Defendant]: Yes.

Q. You agree with me that those words are not in that statement in front of you, correct?

A. Yes.

Q. You testified that you took the gun out of that night stand and then hid it in the kitchen, correct?

. . . .

A. No, I put it behind something that was hidden, to—hide it.

Q. Right. You testified that you took the gun out of the night stand and hid it in the kitchen beside some canisters, I believe, right?

A. Yes.

Q. Do you agree with me that information, as well, is not contained in that statement, correct?

A. Yes.

Q. You also testified the other day that after hiding that gun behind those canisters, you made yourself a bowl of cereal and went into the bedroom, correct?

A. Yes.

Q. You agree with me that information concerning you making the bowl of cereal is not contained in that statement in front of you, correct?

A. Yes.

Q. You agree with me you stated the other day that you walked with that bowl of cereal into the bedroom and then sometime afterwards Julia came in holding the gun that you had hidden in the kitchen, correct?

A. Yes.

. . . .

Q. You also agree with me that information is not contained in the statement in front of you, correct?

A. Yes.

Q. You also stated that, the other day, that you struggled with Julia, and when the gun went off her hands were over the top of the weapon, correct?

A. Well, I think so, because there was a struggle and that happened very quickly.

Q. My question to you is this: You testified the other day that when you struggled with Julia when the gun went off, her hands were over the top of the weapon, is that correct?

A. Yes.

Q. You agree with me that information about her hands being on the gun is not in the statement in front of you?

A. Yes.

Q. You agree with me, you testified the other day, that after Julia had been shot, you went over to your neighbor Elroy's apartment and asked him to call the police or the ambulance, correct?

A. Yes.

Q. But you agree with me the statement in front of you has no mention of you telling Elroy to call the ambulance or—the police or the ambulance, correct?

A. Yes.

. . . .

Q. You agree with me you stated in Court the other day that your revolver, that you owned this black revolver, you didn't know what type of gun it was?

A. Yes.

Q. You agree with me you stated you didn't know because you really didn't know anything about guns? Any types of guns?

A. Yes.

Q. But you agree with me, at least that the statement you have in front of you indicates that you told the police that it was a black .38 revolver?

A. The Detective Olivero and I spoke, and we agreed that, yes, it must have been black .38 revolver like this. Like this.

Q. Sir, all I'm asking you is do you agree with me on the second page of your statement it indicates that you were asked what kind of gun it was you shot Julia with and you answered it was a black .38 revolver? That's the information in that statement?

A. Yes.

. . . .

Q. So seven months after Miss Torres was shot you have a typed, formal written statement to the police, is that correct?

A. Yes.

Q. And at some point after giving that statement you were brought back to the State of New Jersey, is that correct, from New York?

A. Yes.

At the end of that exchange, the prosecutor introduced a new subject:

Q. And at some point after you were brought back to New Jersey, you were given a copy of all the statements, the photographs, discovery in this case, correct?

A. 6 months later.

Q. You agree with me you were given all that information, correct?

A. Yes.

Q. And now, over two years later, after you've had the opportunity to look at all those items, do you agree with me the version of events that you testified here to in court is a lot different than what's contained in that statement.

A. I've been aware that this is not what I said. I've been aware of this since a year and a half.

Q. Sir, what I'm asking you is, at the time of your arrest, when you gave a statement to the police, obviously the police didn't give to you all the statements, the Medical Examiner's report, the photographs involved in this case, is that correct?

A. Yes.

Q. And here, today, you have had the—had the ability to look at all the statements involved in this case, the photographs involved in this case, the medical reports involved in this case?

A. Yes.

In addition the prosecutor asked the following question:

Q. *You've had an opportunity to observe all the witnesses that the State presented come in and testify in this case and tell their story, correct?*

A. Yes.

Q. And now what I'm asking you, you agree with me that the version of events that you have here in court is a lot different than what you gave to the police back seven months after Julia Torres had been shot?

A. Yes.

[ (Emphasis added).]

In summation, the prosecutor made the following argument:

We know seven months after Julia had been killed the defendant gave a formal statement to the police.

We know that in that statement the defendant gave one version of events that occurred.

Now, I submit to you, ... that that version is not the complete truth either.

Remember, this is the defendant who had seven months to come up with a story. But I submit to you that it's a lot closer probably to what happened than with what we heard here in court.

We know that now the *defendant,* after receiving all his discovery, all the photographs, the charts, the diagrams, the reports in this case, *after hearing all the witnesses testify, comes up here and tells you,* ladies and gentlemen, a different version than what's in that piece of paper, that statement. We know those things.

. . . .

Defendant doesn't mention something in his original statement, this is what this is.

Then he gets stuff. He gets photographs, he gets reports, he gets diagrams. And he says to himself I'm going to use this.

[ (Emphasis added).]

When instructing the jury, the judge stated, "[a]rguments, statements, remarks and summations of counsel are not evidence and cannot be treated as such. Although such remarks may point out

what counsel deems important in this case, you must rely solely upon your understanding and recollection of the evidence that was admitted."

The jury convicted defendant of all charges. After appropriate mergers, the trial judge sentenced defendant to a custodial term of forty years with a thirty-year period of parole ineligibility on the murder count and to a concurrent sentence of five years on the possessory weapons offense.

Defendant appealed, and the Appellate Division reversed on the ground that *Daniels* should be given pipeline retroactivity and that its application required the overturning of defendant's convictions based on the comments of the prosecutor regarding defendant's presence at trial as presenting an opportunity for tailoring. We granted the State's petition for certification, 192 *N.J.* 71, 926 *A.*2d 855 (2007), and now reverse.

## II

The State argues that *Daniels* must be applied prospectively because it established a new rule of law; because there was substantial reliance on pre-*Daniels* precedent; and because retroactivity would negatively impact on the administration of justice. On the merits, the State concedes that the prosecutor's tailoring accusations regarding defendant's presence at trial are *Daniels* errors but argues that they do not rise to the level of plain error in light of the strong proofs presented by the State.

Defendant counters that *Daniels* should be applied retroactively because it did not establish a new rule of law; because the pre-*Daniels* rule, which permitted prosecutorial accusations of tailoring, substantially impaired the truth-seeking function and undermined a defendant's right to a fair trial; because the State could not have relied on the old rule in light of a prosecutor's duty of good faith; and because the retroactive application of *Daniels* would not burden the administration of justice. Finally, if *Daniels* applies, defendant contends that the prosecutor's comments regarding his presence in the courtroom amount to plain error

because they deprived him of his right to a fair trial. (Defendant does not challenge the prosecutor's comments regarding his review of the discovery provided by the prosecutor.)

### III

A tailoring allegation is a claim that a witness has adapted his testimony to conform to other evidence that has been produced *during* a trial. Prior to *Daniels*, the United States Supreme Court held, under the Federal Constitution, that a prosecutor could comment on a testifying defendant's presence in the courtroom as an opportunity to tailor his testimony. *See Portuondo, supra,* 529 *U.S.* at 73, 120 *S.Ct.* at 1127, 146 *L.Ed.*2d at 59. In ruling, that Court concluded that there was no historical basis for prohibiting such comments and distinguished them from interdicted statements regarding a defendant's right to remain silent. *Id.* at 65–70, 120 *S.Ct.* at 1123–26, 146 *L.Ed.*2d at 54–57 (discussing *Griffin v. California,* 380 *U.S.* 609, 85 *S.Ct.* 1229, 14 *L.Ed.*2d 106 (1965)). *Portuondo* explained that a prosecutor cannot comment negatively on a defendant's refusal to testify because that would be urging the jury to do something it *"is not permitted to do "*— draw a negative inference from a defendant's silence. *Id.* at 67, 120 *S.Ct.* at 1124, 146 *L.Ed.*2d at 55 (emphasis omitted). In essence the Court held that there is no logical inference of guilt from silence. *Ibid.* On the contrary, *Portuondo* explained that when a defendant is present in court and testifies, "it *is* natural and irresistible for a jury, in evaluating the relative credibility of a defendant who testifies last, to have in mind and weigh in balance the fact that he heard the testimony of all those who preceded him." *Id.* at 67–68, 120 *S.Ct.* at 1124, 146 *L.Ed.*2d at 55.

> [T]he principle [defendant] asks us to adopt here differs from what we adopted in *Griffin* in one or the other of the following respects: It either prohibits inviting the jury to do what the jury is perfectly entitled to do; or it requires the jury to do what is practically impossible.
>
> [*Id.* at 68, 120 *S.Ct.* at 1124, 146 *L.Ed.*2d at 55 (footnote omitted).]

Ultimately, the Court concluded that a prosecutor may accuse a defendant of tailoring based on trial presence because such com-

ments are "appropriate" and "sometimes essential [ ] to the central function of the trial, which is to discover the truth." *Id.* at 73, 120 *S.Ct.* at 1127, 146 *L.Ed.*2d at 59.

Our appellate case law has, for decades, conformed to the *Portuondo* approach and permitted the kind of accusations allowed in that case. *See State v. Buscham,* 360 *N.J.Super.* 346, 366, 823 *A.*2d 71 (App.Div.2003) (holding prosecutor's reference to defendant being only witness in courtroom during testimony as tailoring opportunity not plain error). In *State v. Robinson,* 157 *N.J.Super.* 118, 119–20, 384 *A.*2d 569 (App.Div.), *certif. denied,* 77 *N.J.* 484, 391 *A.*2d 498 (1978), another panel held that the prosecutor's tailoring accusations during summation based on defendant's presence were proper. The panel explained that it was well-settled that a testifying defendant "subjects himself to cross-examination as to the credibility of his story. . . . Here the issue of defendant's credibility was whether his testimony was tailored to that of the testimony of other witnesses, a perfectly proper inquiry." *Id.* at 120, 384 *A.*2d 569.

In *Daniels, supra,* our tailoring law underwent a sea-change. There, the defendant testified on his own behalf, and, during summation, the prosecutor stated that "the defendant sits with counsel, listens to the entire case and he listens to each one of the State's witness[es], he knows what facts he can't get past. . . . But he can choose to craft his version to accommodate those facts." *Daniels, supra,* 182 *N.J.* at 87, 861 *A.*2d 808 (emphasis omitted). Defense counsel did not object to those remarks, and subsequently, the trial judge instructed the jury that it could not consider any remarks made during summation as evidence. *Ibid.* The jury convicted the defendant of robbery. *Ibid.*

Defendant appealed and the Appellate Division affirmed, declaring the challenged comments permissible under *Portuondo. Id.* at 88, 861 *A.*2d 808. In reversing, we made the point that we are responsible for the exercise of supervisory authority over the criminal justice system and that we would view the issue through that lens. *Id.* at 95–96, 861 *A.*2d 808. Accordingly, we accepted

the Portuondo Court's invitation to decide whether the prosecutor's tailoring comments are " 'desirable as a matter of sound trial practice.' " *Id.* at 97, 861 *A.*2d 808 (quoting *Portuondo, supra,* 529 *U.S.* at 73 n. 4, 120 *S.Ct.* at 1127 n. 4, 146 *L.Ed.*2d at 58 n. 4.).

In *Daniels,* we affirmed the basic notion that some challenges to a defendant's credibility are permissible and others are not. Cleaving essentially to our rules governing prosecutorial misconduct, we reaffirmed that evidentially baseless tailoring accusations, like other baseless credibility challenges, are prohibited. *Ibid.* We then declared that a comment rooted in a defendant's presence at trial, which had previously been considered permissible, is actually improper. *Id.* at 98, 861 *A.*2d 808 (citing *Portuondo, supra,* 529 *U.S.* at 76, 120 *S.Ct.* at 1129, 146 *L.Ed.*2d at 60 (Stevens, J., concurring)).

Accordingly, we established a bright-line rule that the prosecutor's summation references to the defendant's ability to "sit" and "listen" to witness testimony, and thereafter "craft his version" of the events were impermissible *"even when the record indicates that defendant tailored his testimony."* *Id.* at 101, 861 *A.*2d 808 (emphasis added). We concluded that the trial judge's instructions failed to cure the harmful effect of the accusations and characterized the prosecutor's claims of tailoring as plain error. *Ibid.*

## IV

■ *Daniels* was silent regarding its retroactivity.[2] We therefore undertake that analysis here. The threshold retroactivity question is always the same—whether a new rule of law has been announced. *State v. Colbert,* 190 *N.J.* 14, 22, 918 *A.*2d 14 (2007); *see also State v. Molina,* 187 *N.J.* 531, 542–43, 902 *A.*2d 200 (2006); *State v. Cummings,* 184 *N.J.* 84, 96–97, 875 *A.*2d 906 (2005).

---

2 In *State v. Roman,* 382 *N.J.Super.* 44, 58–59, 887 *A.*2d 715 (App.Div.2005), an appellate panel applied the *Daniels* holding retroactively, without analysis and the opinion is therefore not helpful here.

A case announces a new rule of law for retroactivity purposes if there is a " 'sudden and generally unanticipated repudiation of a long-standing practice.' " *State v. Purnell,* 161 *N.J.* 44, 53, 735 *A.*2d 513 (1999) (quoting *State v. Afanador,* 151 *N.J.* 41, 58, 697 *A.*2d 529 (1997)). A new rule exists if " 'it breaks new ground or imposes a new obligation on the States or the Federal Government ... [or] if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.' " *State v. Lark,* 117 *N.J.* 331, 339, 567 *A.*2d 197 (1989) (quoting *Teague v. Lane,* 489 *U.S.* 288, 301, 109 *S.Ct.* 1060, 1070, 103 *L.Ed.*2d 334, 349 (1989)). Obviously, where a new rule is not at issue, a retroactivity inquiry is unnecessary. *See Colbert, supra,* 190 *N.J.* at 22, 918 *A.*2d 14. Courts will simply construe the rule as "one that has always applied." *Ibid.*

If, however, a new rule of law is implicated, we have four options:

> (1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule ... [pipeline] retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues of direct review; and, finally, (4) give the new rule complete retroactive effect.
>
> [*State v. Burstein,* 85 *N.J.* 394, 402–03, 427 *A.*2d 525 (1981) (citation omitted).]

In determining which option to adopt, we consider the following three factors: " '(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice.' " *State v. Knight,* 145 *N.J.* 233, 251, 678 *A.*2d 642 (1996) (quoting *State v. Nash,* 64 *N.J.* 464, 471, 317 *A.*2d 689 (1974)).

The first factor, the purpose factor, is "often the pivotal consideration." *Knight, supra,* 145 *N.J.* at 251, 678 *A.*2d 642 (citation omitted). "[W]here the purpose of the new rule 'is to overcome an aspect of the criminal trial that *substantially impairs* its truth-finding function' and raises 'serious question about the

accuracy of guilty verdicts in past trials' " the first factor points to a complete retroactive application. *Burstein, supra,* 85 *N.J.* at 406–07, 427 *A.*2d 525 (quoting *Williams v. United States,* 401 *U.S.* 646, 653, 91 *S.Ct.* 1148, 1152, 28 *L.Ed.*2d 388, 395 (1971)). That is so without regard to whether the State relied on the old rule or whether retroactivity would have an impact on the efficient administration of justice. *Id.* at 407, 427 *A.*2d 525. For example, full retroactivity was afforded

> to the requirement that the State may not escape its burden of proof beyond a reasonable doubt by using presumptions to shift burdens of proof to the defense, *Hankerson v. North Carolina,* 432 *U.S.* 233, 97 *S.Ct.* 2339, 53 *L.Ed.*2d 306 (1977); the requirement that, in juvenile proceedings, the State prove beyond a reasonable doubt all elements of an offense that would constitute a crime if committed by an adult, *Ivan V. v. City of New York,* 407 *U.S.* 203, 92 *S.Ct.* 1951, 32 *L.Ed.*2d 659 (1972); the right to counsel at preliminary hearings in which a defendant must assert certain defenses or lose them, *Arsenault v. Massachusetts,* 393 *U.S.* 5, 89 *S.Ct.* 35, 21 *L.Ed.*2d 5 (1968); the rule barring the admission of one co-defendant's extrajudicial confession implicating another defendant, *Roberts v. Russell,* 392 *U.S.* 293, 88 *S.Ct.* 1921, 20 *L.Ed.*2d 1100 (1968); the right to counsel at trial, *Pickelsimer v. Wainwright,* 375 *U.S.* 2, 84 *S.Ct.* 80, 11 *L.Ed.*2d 41 (1963); and the requirement that a confession made some time ago meet current standards of voluntariness, *Reck v. Pate,* 367 *U.S.* 433, 81 *S.Ct.* 1541, 6 *L.Ed.*2d 948 (1961).
>
> [*Ibid.*]

Those extraordinary situations clearly warranted full retroactivity because they struck at the heart of the truth-seeking function.

On the contrary, in cases where the new rule is designed to enhance the reliability of the fact-finding process, but the old rule did not "substantially impair" the accuracy of that process, a court will balance the first prong against the second and third. *Id.* at 410, 427 *A.*2d 525; *see also Molina, supra,* 187 *N.J.* at 543, 902 *A.*2d 200. Applying the degree-of-reliance factor, a court will consider whether the State administered the old rule in " 'good faith reliance [on] then prevailing constitutional norms.' " *Purnell, supra,* 161 *N.J.* at 55, 735 *A.*2d 513 (quoting *State v. Howery,* 80 *N.J.* 563, 570, 404 *A.*2d 632, *cert. denied,* 444 *U.S.* 994, 100 *S.Ct.* 527, 62 *L.Ed.*2d 424 (1979)). Under the administration-of-justice factor, retroactivity will not be afforded if it "would undermine the validity of large numbers of convictions." *Knight, supra,* 145 *N.J.* at 252, 678 *A.*2d 642. Ultimately, the retroactivity

determination turns on the court's view of " 'what is just and consonant with public policy in the particular situation presented.' " *Id.* at 251, 678 *A.*2d 642 (quoting *Nash, supra,* 64 *N.J.* at 469, 317 *A.*2d 689).

## V

In a broad sweep, *Daniels* recategorized comments on a defendant's presence at trial as interdicted under all circumstances. That unanticipated ruling clearly departed from New Jersey precedent and from the United States Supreme Court's holding in *Portuondo* which allowed such challenges. In that respect, *Daniels* was a break with past practice and constituted a new rule of law. *See Buscham, supra,* 360 *N.J.Super.* at 366, 823 *A.*2d 71; *Robinson, supra,* 157 *N.J.Super.* at 119–20, 384 *A.*2d 569.

That brings us to the three-factor test. As we have said, under the purpose factor, the modification of a rule will ordinarily receive full retroactivity if the old rule *substantially* impaired the truth-seeking function of the trial. *See Burstein, supra,* 85 *N.J.* at 406–07, 427 *A.*2d 525. Defendant contends that that standard was met, and therefore, the new rule should receive retroactive application. The State counters that the old rule was a well-settled and legitimate means of fairly attacking a defendant's credibility while guaranteeing him freedom from sequestration and did not impair the truth-seeking function in any discernible way. Although *Daniels* interdicted tailoring claims as, in some measure, impacting the truth-seeking function, it seems to us that that case is quite different from the kinds of situations that are recognized as warranting complete retroactivity. *See, e.g., Hankerson, supra,* 432 *U.S.* at 243–44, 97 *S.Ct.* at 2345, 53 *L.Ed.*2d at 316 (applying retroactively prohibition against use of presumptions attempting to shift burden of proof to defendant); *Pickelsimer, supra,* 375 *U.S.* at 2, 84 *S.Ct.* at 80, 11 *L.Ed.*2d at 41 (applying retroactively requirement that defendant have right to counsel at trial).

Further, as *Portuondo* observed, "in evaluating the relative credibility of a defendant who testifies last, [the jury will always] [ ] have in mind and weigh in the balance the fact that he has heard the testimony of those who preceded him." *Portuondo, supra,* 529 *U.S.* at 67–68, 120 *S.Ct.* at 1124, 146 *L.Ed.*2d at 55. To the extent that is so, any additional reference to a defendant's presence by a prosecutor would be unlikely to have a *substantial* effect on the truth-seeking function. Thus, though we continue to believe that the *Daniels* rule is the correct one, the purpose factor does not weigh clearly in favor of complete retroactive application.

We therefore move to the remaining elements of the test. Under the degree-of-reliance factor, the State must have administered the old rule in " 'good faith reliance [on] then-prevailing constitutional norms.'" *Purnell, supra,* 161 *N.J.* at 55, 735 *A.*2d 513 (quoting *Howery, supra,* 80 *N.J.* at 570, 404 *A.*2d 632). Our courts began permitting tailoring accusations based on presence thirty years before *Daniels. Robinson, supra,* 157 *N.J.Super.* at 119–20, 384 *A.*2d 569. That precedent endured until we decided *Daniels* in 2004. Thus, the State justifiably relied on the old rule, and the second factor weighs in favor of a prospective application.

The weight to be accorded the administration-of-justice factor is the last consideration. We generally try to avoid retroactive application if many cases will be impacted. *See Knight, supra,* 145 *N.J.* at 252, 678 *A.*2d 642. Here, we have no dispositive statistics regarding the universe of potential cases that could be affected if the rule is applied retroactively.[3] Generally, the absence of data concerning "the number and kinds of cases that would be affected by a rule of complete retroactivity and the impact that complete retroactivity would have on the administra-

---

[3] Without explaining its methodology or vouching for the accuracy of its results, the State, in a post-certification, pre-argument submission, suggested "[t]he data gathered reveals that currently, fewer than ten cases would be affected" by a retroactive application of *Daniels.* Defendant did not challenge the representations contained in that submission.

tion of justice mandates that the new rule should apply only to cases pending direct review at the time of the rule's announcement." *State v. Bellamy,* 178 *N.J.* 127, 142–43, 835 *A.*2d 1231 (2003) (citing *State v. Czachor,* 82 *N.J.* 392, 409–10, 413 *A.*2d 593 (1980)). Consistent with our view of what is just and consonant with public policy, we adopt that view here and accord *Daniels* only pipeline retroactivity. Consequently, because this case is on direct appeal, *Daniels* applies.

## VI

The State concedes that the prosecutor's comments regarding defendant's presence in the courtroom during trial, which were not subject to an objection, violated *Daniels,* but argues that the remarks did not rise to the level of plain error.

To be sure, not every prosecutorial misstatement warrants a new trial. *See, e.g., State v. Smith,* 167 *N.J.* 158, 178, 770 *A.*2d 255 (2001). Where a defendant fails to object to the challenged statements and thus deprives the trial judge of the opportunity to ameliorate any perceived errors, he must establish that the comments constitute plain error under *Rule* 2:10–2. Plain error must be "'sufficient [to raise] a reasonable doubt as to whether the error led the jury to a result that it otherwise might not have reached.'" *Daniels, supra,* 182 *N.J.* at 102, 861 *A.*2d 808 (quoting *State v. Macon,* 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971)).

Here, defendant acknowledged that he killed Torres, but gave two different versions of the incident, one before and one during trial. In the pretrial version, defendant said that Torres was hitting him with a broom because of what she perceived as his infidelity; that he took out the gun and threatened her with it; and that he was still threatening her when it "went off." At trial, defendant repeated his testimony about the altercation with Torres. He then testified that he hid the gun from her; that she retrieved it from the hiding place and "came at him" with it; and that while he was attempting to disarm her, the gun accidentally discharged. Defendant's credibility was severely damaged by

those statements which were at odds with each other in critical respects, and the prosecutor capitalized on that during cross-examination. To be sure, the prosecutor's references to defendant's presence at trial as a tailoring opportunity were a mistake in light of what we said in *Daniels*. However, defendant's testimony at trial was obviously not cut to fit that of the other witnesses he saw. On the contrary, the only "tailoring" he did was to back-peddle with respect to his earlier pretrial statement that likely would have convicted him if left unchanged.

Thus, the attack on defendant's credibility was unlike the attack in *Daniels* where defendant gave testimony that conformed to that of the other witnesses and was challenged solely because of his presence in the courtroom. On those facts, we concluded that the prosecutor's comment could have prejudiced defendant. Here, our careful canvass of the record has led us to conclude otherwise. In light of the nature of the credibility challenge to defendant, it does not appear that the prosecutor's fleeting references to defendant's presence in the courtroom could have led the jury to a result it otherwise would not have reached. In short, we do not find that plain error occurred, and we reverse the Appellate Division's determination to the contrary.

## VII

The judgment of the Appellate Division is reversed. The matter is remanded to that court for disposition of the remaining issues raised by defendant on appeal.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO, and HOENS—7.

*Opposed*—None.