# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1225-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

J.J.-R.,

     Defendant-Appellant.

_____

Submitted January 13, 2020 – Decided April 30, 2020

Before Judges Fasciale and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 15-07-0602.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Deputy Public Defender, of counsel and on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Ali Y. Ozbek, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant J.J.-R. was charged in a three-count indictment with crimes related to the sexual assault of R.P., his eleven-year-old stepdaughter, between June 1, 2001 and April 30, 2002.[1] He appeals from his conviction by jury and attendant sentence for first-degree aggravated sexual assault for penile-anal penetration and digital-vaginal penetration, N.J.S.A. 2C:14-2(a)(1) (count one); second-degree sexual assault for touching R.P.'s vagina, breasts and buttocks, N.J.S.A. 2C:14-2(b) (count two); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (count three). In his merits brief, defendant argues:

> POINT I
>
> REVERSAL OF DEFENDANT'S CONVICTIONS SHOULD BE ORDERED BECAUSE HE WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE ERRONEOUS ADMISSION OF TESTIMONY ABOUT CHILD SEXUAL ABUSE ACCOMMODATION SYNDROME. U.S. CONST. AMENDS. V AND XIV; N.J. CONST., ART. I, PARS. 1, 9, AND 10.
>
> A.    Introduction.
>
> B.    The ruling of State v. J.L.G., [234] N.J. [265] (2018), Prohibiting Testimony About the Discredited Concept of C[S]AAS, Applies Here.

---

[1] We use initials to protect the privacy of R.P. See N.J.S.A. 2A:82-46; R. 1:38-3(c)(9).

C. Even if J.L.G. Were not Given Retroactive Effect and Applied to the Present Matter, CSAAS Testimony Should not Have Been Admitted Under N.J.R.E. 702 Because it is not Based on Reliable Science.

D. Defendant Was Unfairly Prejudiced by Testimony About CSAAS.

POINT II

REVERSAL OF DEFENDANT'S CONVICTIONS SHOULD BE ORDERED BECAUSE HE WAS DENIED HIS RIGHT TO PRESENT A DEFENSE BY THE TRIAL COURT'S RULING PRECLUDING HIM FROM INTRODUCING EVIDENCE ON THE VICTIM'S MOTIVE TO FABRICATE WITHOUT OPENING THE DOOR TO UNCHARGED ALLEGATIONS OF SEXUAL ABUSE. U.S. CONST. AMENDS. V, VI, AND XIV; N.J. CONST., ART. I, PARS. 1 AND 10.

POINT III

THE MATTER SHOULD BE REMANDED FOR RESENTENCING BECAUSE THE TRIAL COURT FOUND FIVE UNSUSTAINABLE AGGRAVATING FACTORS.

In a pro se brief, he adds:

POINT I

[DEFENDANT] WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN HIS ATTORNEY FAILED TO FILE A CLEARLY MERITORIOUS MOTION TO QUASH THE

3

INDICTMENT AS TO COUNT [THREE], N.J.S.[A.] 2C:24-4[(a)](1).

POINT II

THE LAW DIVISION IMPOSED AN ILLEGAL SENTENCE UPON . . . DEFENDANT BECAUSE IT IS NOT IN ACCORDANCE WITH THE SENTENCES AUTHORIZED BY LAW UNDER NEW JERSEY STATUTES.

POINT III

DEFENDANT WAS DENIED DUE PROCESS BECAUSE THE INDICTMENT DOES NOT SET FORTH THE DATE OF THE ALLEGED CRIME WHICH CHANGES THE POTENTIAL SENTENCE DEFENDANT IS EXPOSED TO.

Applying the pertinent law, some of which was handed down after defendant's trial but during the pendency of his appeal, we are constrained to reverse and remand for a new trial.

R.P. testified defendant first assaulted her when she was in the seventh grade on spring break. She awoke to find defendant's hands in her pants and under her shirt, touching her breasts and digitally penetrating her vagina. R.P. also told the jury that "a little after springtime" defendant grabbed her from behind and, again, touched her breast and digitally penetrated her vagina. Defendant stopped the assault just before R.P.'s mother, who was pregnant with R.P.'s sister, entered the room. Although R.P. disclosed the incident, albeit not

4

in "too much detail," the police were not notified. The third incident occurred two days later, just before her sister was born—ten days prior to R.P.'s twelfth birthday. R.P. testified defendant came up behind her as she was taking clothes out of the dryer, pinned her hands, pulled down her pants and "put his penis inside [her] anus[.]" She did not tell her mother—who had been in the shower—but "just grabbed the clothes, pulled up [her] pants and ran straight up to [her] room to cry [her]self to sleep."

Other than her discussion with her mother after the second incident, R.P. did not tell anyone of the assaults until 2004 when she was in the ninth grade after the family moved to Florida. She told a friend some details about the assaults, whereafter a police officer and a social worker interviewed her. She told them "everything was a lie" because one of the interviewers told her "if it was true, that [R.P.'s sister and she] would go to foster care, [her] mom and [defendant] would go to jail and it was just going to be a big mess."

R.P. testified she remained silent until her senior year in high school when she disclosed some details of the assaults—she described it as "pretty much scratch[ing] the surface"—during an in-class oral presentation. The same social worker responded; police later questioned her and she was sent home. Defendant was not charged. R.P. said her mother did not believe her, thinking

5

she was "[a] rebellious teenager . . . just acting up."  R.P. said she was upset but understood her mother's position because of her repeated retractions.

In the beginning of June 2014—after having a son at nineteen, moving from her mother's house at age twenty, and having a second child—R.P. was engaged to be married and "wanted to start a clean slate.  [She] didn't want to go into a marriage with problems, with issues, with depression, with anxiety.  [She] didn't want to start like that."  She went to the police and, again, reported the assaults.  The detective assigned to the case arranged three recorded calls between R.P. and defendant that were ultimately played before the jury.[2]

After R.P. testified, the State introduced the testimony of Dr. Anthony Vincent D'Urso.  Dr. D'Urso testified that he was "the supervising psychologist and section chief of the Audrey Hepburn Children's House," and related his advanced degrees and extensive background before being admitted without objection "as an expert in the area of Child Sexual Abuse Accommodation Syndrome" (CSAAS).  Dr. D'Urso described CSAAS as "a description of characteristics that we know for kids known to be abused," explaining "the reason it was developed was to help people understand how child sexual assault

---

[2]  The phone calls were conducted in Spanish and the jury was given a redacted transcription translated in English.  The transcripts were not provided in the record on appeal.

differs from adult sexual assault and [that] we would make assumptions if we didn't have the background or the educative factors that make it different."  After giving a brief history leading up to an article by Dr. Rolland Summit that framed CSAAS, Dr. D'Urso identified and explained the five CSAAS component behaviors:  secrecy; helplessness; coercion, entrapment or accommodation; delayed or unconvincing disclosure; and retraction.

During the pendency of this appeal, our Supreme Court decided J.L.G., holding:

> Based on what is known today, it is no longer possible to conclude that CSAAS has a sufficiently reliable basis in science to be the subject of expert testimony.  We find continued scientific support for only one aspect of the theory -- delayed disclosure -- because scientists generally accept that a significant percentage of children delay reporting sexual abuse.
>
> We therefore hold that expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials.  Evidence about delayed disclosure can be presented if it satisfies all parts of the applicable evidence rule.  See N.J.R.E. 702.  In particular, the State must show that the evidence is beyond the understanding of the average juror.
>
> [234 N.J. at 272 (emphasis added).]

Defendant maintains J.L.G.'s "holding is a new rule of law" that should be accorded "complete retroactivity, or[,] at a minimum, pipeline retroactivity." The State argues that J.L.G. announced a new rule of law that did not revise the long line of cases recognizing CSAAS but, instead, provided "an updated analysis of the general acceptance of CSAAS in the scientific community," which should not be applied retroactively.

We need not till an already furrowed field. We see no reason to stray from our decision in State v. G.E.P, concluding J.L.G.'s holding "should be given at least pipeline retroactivity," 458 N.J. Super. 436, 448 (App. Div.), certif. granted, 239 N.J. 598 (2019), rendering it applicable to all prospective cases arising after the announcement of the new rule of law, parties in the case considered, and pending cases in which "the parties have not yet exhausted all avenues of direct review," State v. Burstein, 85 N.J. 394, 403 (1981), when the Court issued its opinion in J.L.G. Defendant's appeal, filed on November 13, 2017, was pending when J.L.G. was decided on July 31, 2018. We, like the court in G.E.P., "must decide only whether pipeline retroactivity is appropriate." 458 N.J. Super. at 446.

Judge Koblitz cogently analyzed the three factors considered in determining whether a new rule of law should be made purely prospective,

prospective but applicable to the case announcing the new rule, retroactive to cases in the pipeline or completely retroactive:

> "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice."
>
> [G.E.P., 458 N.J. Super at 445 (quoting State v. Feal, 194 N.J. 293, 308 (2008)).]

The G.E.P. court distinguished CSAAS cases from others that were conferred full retroactivity, "where 'the purpose of the new rule "is to overcome an aspect of the criminal trial that substantially impairs it truth-finding function" and raises "serious question[s] about the accuracy of guilty verdicts in past trials . . . [,]"'" ibid. (alterations in original) (emphasis omitted) (quoting Feal, 194 N.J. at 308-09), recognizing that the first factor must be balanced against the second and third in cases "'where the new rule is designed to enhance the reliability of the fact-finding process, but the old rule did not "substantially impair" the accuracy of that process[,]'" id. at 446 (quoting Feal, 194 N.J. at 309). The factor that "loom[ed] largest" in the court's analysis was the first factor, the purpose of J.L.G.'s holding:  "to avoid unjust convictions in which the State's proofs are unfairly bolstered by expert opinion that lacks a reliable

basis." Id. at 447. The court also recognized the wide utilization of CSAAS testimony by prosecutors who relied on the cases sanctioning its use, ibid., beginning with State v. J.Q., 130 N.J. 554, 556 (1993) (finding CSAAS had "a sufficiently reliable scientific basis" to justify presentation to a jury); but noted the restrictions imposed on the use of such testimony by the Court over the years, id. at 446-47; see also J.L.G., 234 N.J. at 288. And, the court credited the State's representation that there were forty cases, at minimum, that would be in the pipeline at the time G.E.P. was decided. G.E.P., 458 N.J. Super. at 448.

That reasoning is still sound. We disagree with the State's assertion that J.L.G. did not revise J.Q. and its progeny. The Court clearly prohibited the introduction of CSAAS-related expert on any of the five syndrome factors except delayed disclosure. J.L.G., 234 N.J. at 303. We further agree with our colleagues that unlike cases involving eyewitness identification, described by the Henderson Court as "a staple of criminal trials," State v. Henderson, 208 N.J. 208, 302 (2011), CSAAS expert testimony is not involved in as many cases, G.E.P., 458 N.J. Super. at 448. And, we concur with our colleagues' recognition of the State's reliance of past precedent, even as its application was narrowed. As the J.L.G. Court observed, "[i]n none of those cases . . . did the Court reassess

the scientific underpinning of CSAAS evidence." 234 N.J. at 288. As such, the limitations imposed by J.L.G. on CSAAS testimony are applicable to this case.

Before considering the impact of the CSAAS testimony on defendant's trial, we briefly address defendant's contention that that testimony was inadmissible under N.J.R.E. 702 because it was not based on reliable science. The J.L.G. Court reviewed de novo whether the reliability of CSAAS testimony was established under the Frye test,[3] id. at 301, a test the Court held applicable in criminal cases, id. at 280. Although the Court concluded "evidence about CSAAS as a whole" and four of its factors: secrecy (including denial), helplessness, accommodation and retraction, did not meet the Frye standard for reliability, id. at 297, 303, it found "consistent and long-standing support in the scientific literature and among experts only for the proposition that a significant percentage of victims of child sexual abuse delay disclosure," id. at 302; see also id. at 294-95. Thus, "when the other prongs of Rule 702 are met, the State may present expert evidence on delayed disclosure among victims of child sexual abuse -- and only that evidence -- to a jury." Id. at 303. We abide by the Court's

---

[3]  Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923) (holding admissibility of proposed expert testimony is conditioned on whether the scientific basis for the opinion has "gained general acceptance in the particular field in which it belongs").

A-1225-17T4

holding. See Scannavino v. Walsh, 445 N.J. Super. 162, 172 (App. Div. 2016) (second alteration in original) (stating that "[b]ecause we are an intermediate appellate court, we are bound to follow the law as it has been expressed by . . . our Supreme Court" (quoting Lake Valley Assocs., LLC v. Township of Pemberton, 411 N.J. Super. 501, 507 (App. Div. 2010))).

The decision to admit CSAAS delayed-disclosure testimony "turn[s] on the facts of each case." J.L.G., 234 N.J. at 272. Reviewing the trial proofs through J.L.G.'s lens, we first note the State's concession that this case turned on the credibility of R.P. and defendant who also testified at trial and denied all crimes. We also consider that R.P. did not disclose the 2001 assaults, except for the second one to her mother, until 2004, 2007 and 2014. And, our analysis cannot ignore R.P.'s 2004 recantation.

R.P. testified as to the reasons for her non-disclosure and recantations. She did not tell her mother about the first attack because she was "in shock" and "didn't know how to respond[.]" She said she did not press after her initial disclosure about the second incident because she did not want to cause stress to her mother whose pregnancy was high-risk. R.P. testified that after the third assault, defendant came to her room and told her not to tell her mother and explained that if she did, "[her] mom's going to have to raise [her] and . . . [her]

sister by [her]self and [defendant's] not going to help . . . support [her] mom or anything." R.P. said she was aware of how important defendant's financial support was and feared her sister would grow up without a father, so she decided she would "just sacrifice [her]self." The next time defendant woke her up, it was to tell her to call the paramedics because her mother was having complications with her pregnancy. R.P. testified that she did not tell anyone about the third incident "in the immediate time" after her sister was born "because of what [defendant] told [her] that he wouldn't take care of [her] mom and [her] sister, if [she] told anyone. Because [she] would get in trouble, [defendant] would get in trouble, [she] just decided just to keep it to [her]self."

R.P. further explained that she did not disclose as an adult until she was almost twenty-five years old because she was focused on her children and herself during a "rough time" which she experienced as a young mother. She also explained her 2004 recantation occurred because her sister and she faced the threat of foster-care placement and her mother and stepfather faced jail.

Against that backdrop, Dr. D'Urso testified about all five CSAAS factors. As to secrecy, he said:

> there's one, generally unequivocal fact. Something a fact there's no study in the world that says this factor is untrue and that is that kids typically do not tell about the abuse after the first overt sexual behavior. Some

kids tell right away, but typically kids who are victims of sexual abuse do not tell after the first time. So secrecy, which is the first element has to do with the time period from when the child first is engaged in overt sexual behavior to the time they tell.

He also discussed reasons why children of various ages might feel helplessness, including victims of intra-familial abuse. In a discourse on "coercion, entrapment and accommodation," the doctor testified:

But we know that child abuse is a relational crime. That is that they know the person and that it happens multiple events. So entrapment refers to that dynamic of being caught in a repetitive crime. They may be introduced to the sexual behavior and then it repeats itself and then they feel like who would believe me if I were to tell now. Or the perpetrator may say that to them, no one's going to believe you that . . . you weren't consenting to this.

He added: "A perpetrator may say to them, if you tell it'll hurt the family. If you tell we'll lose our house."

On delayed or unconvincing disclosure, he told the jury: "That in all of research is a finding that everyone agrees to that kids typically don't tell after the first time. But Dr. Summit didn't talk about it solely from delayed disclosure, he talked about it as unconvincing disclosure." Dr. D'urso delineated the various authorities to whom a child would have to talk to during an investigation and opined that "it's not that [a child's disclosure to those people] are all that

different, but sometimes they know the people have roles in their lives and they'll talk to them and answer their questions relative to that role[.]"  In explaining why a child's disclosure might lack detail or appear disorganized, Dr. D'Urso testified:

> [I]n this particular area the post disclosure area . . . Dr. Summit used the word -- which he referred to as piecemeal disclosure.  Since the crime is -- in essence their body . . . and their minds['] piecemeal disclosure happens when kids typically don't tell everything that happened to them the first time they're interviewed.
>
> . . . .
>
> So piecemeal disclosure has to do with their ability to recall, their willingness to tell because of emotional factors or the memories of the events that have happened.

In discussing recantation, he said:

> So recantation means that after kids make a disclosure they may, in whole or in part take it back. So they may take it back because they see the implications of the abuse on the family, or friends. They may take it back because they -- it's a relational crime.  They don't always negatively perceive the perpetrator.  And so when they start seeing the things that are going to happen they may pull back . . . on those disclosures.
>
> . . . .
>
> The -- recantation or retraction . . . is the pulling back of either some or all of it.  The research typically

15

tells us kids recant as a function as support. So inside a family a child may retract if they're not being supported.

He also explained that CSAAS testimony was designed "to educate the public about the differences between sexual assault that occurs and . . . how kids may respond differently than adults. So . . . we know that sometimes adults retract allegations of domestic violence and sexual assault, kids do so for different reasons."

Not only did the CSAAS testimony encompass four of the prongs now precluded from admission, the testimony also contravened the Court's admonition:

> Trial judges must exercise care to limit the testimony and bar any reference to "CSAAS," an abuse "syndrome," other CSAAS "behaviors" aside from delayed disclosure, or causes for delayed disclosure. The testimony should not stray from explaining that delayed disclosure commonly occurs among victims of child sexual abuse, and offering a basis for that conclusion.

> [J.L.G., 234 N.J. at 303.]

The prosecutor's summation highlighted that Dr. D'Urso explained to the jury

> some of the reasons why children delay in telling and why when they tell they might try to take it back and

some of those things that lead up to . . . a delayed disclosure, are threats that may be made against the child. [Dr. D'Urso] didn't talk about little kids being more susceptible to threats than older kids, he talks about a difference in threats, the quality of threats, the reason for the threat and the impact subjectively it has on the person who hears the threat in this case. So, what does that mean in terms of [R.P.]? [The jury] had a long painful history with [R.P.] in terms of her attempts to try to come forward. Let's start with the first time.

The prosecutor then related R.P.'s 2004 disclosure and recantation, and her 2007 and 2014 disclosures.

We also consider the other proofs in this case, including the recorded phone calls:

[R.P.]: "I cannot forget, [defendant]. Do you know how old I was when you first started that? That was my childhood. I want you to clarify it for me. Explain to me why."

. . . .

[DEFENDANT]: "That is something personal."

. . . .

[R.P.]: "I was very young when you raped me and I need to know why."

. . . .

[DEFENDANT]: "Oh, my God."

. . . .

[R.P.]: "Explain to me something, tell me something at least. Even if you call me later, I don't care, tell me something because I need to know. This is affecting me a lot."

. . . .

[DEFENDANT]: "No, be calm. What you're thinking didn't happen like that."

The second controlled telephone call, which took place on July 20, 2014, recorded the following:

[R.P.]: "I'm thinking about what you did to me. I am talking about what you did to me in New Jersey. You don't feel sorry for that?"

. . . .

[DEFENDANT]: "I don't really remember that, [R.P.] Really, you're saying something about a basement?"

The third and final controlled telephone call, which took place on July 23, 2014, recorded the following:

[R.P.]: "Why did you do what you did?"

. . . .

[DEFENDANT]: "Why are asking me things, [R.P.]?"

. . . .

[R.P.]: "I need to know."

[DEFENDANT]: "Oh, my God, you come to me with the same thing."

. . . .

[R.P.]: "Why did you rape me?"

. . . .

[DEFENDANT]: "I never raped you at any time."

. . . .

[R.P.]: "Don't you remember?"

. . . .

[DEFENDANT]: "Well, let me remember. I don't remember what you are telling me, in what house? . . . I don't recall this."

Although defendant did not overtly implicate himself during these conversations, the prosecutor—in summation during which portions of the recordings were read into the record—argued defendant "never at any point tells [R.P.] you're crazy, that's so insane, I don't know or how could you ever say that to me," contending defendant's was not a normal reaction "to an allegation of rape by [R.P.]" But, as defendant posits in his merits brief, "his reaction must be examined in context: twice he was accused of these acts, once in 2004[] and again in 2007. In 2014, [when the calls were made,] he might reasonably view

19

the renewed accusations with resignation, whether they were substantively true or not."

The limited physical evidence of the charged crimes supports the parties' shared theory that the linchpin of the case was the credibility of R.P. and defendant. Under those circumstances, the admission of the CSAAS testimony cannot be determined harmless.

> An error is harmless unless, in light of the record as a whole, there is a "possibility that it led to an unjust verdict" -- that is, a possibility "sufficient to raise a reasonable doubt" that "the error led the jury to a result it otherwise might not have reached."
>
> [Id. at 306 (quoting State v. Macon, 57 N.J. 325, 335-36 (1971)).]

Our determination is buttressed by the fact that R.P.'s reasons for non-disclosure were straightforward; that is, they were not "beyond the ken of the average juror." Id. at 304 (quoting State v. Kelly, 97 N.J. 178, 208 (1984)). It is the State's burden to make that showing. Id. at 272. Under N.J.R.E. 702, "expert testimony is not appropriate to explain what a jury can understand by itself." Id. at 305. As the Court explained:

> If a child witness cannot offer a rational explanation for the delay in disclosing abuse -- which may happen during the pretrial investigative phase or on the witness stand -- expert evidence may be admitted to help the jury understand the child's behavior. In this context, we

do not accept that jurors can interpret and understand an explanation that is not offered.

On the other hand, a young teenager's explanation from the witness stand may fall within the ken of the average juror and might be assessed without expert testimony.

[Ibid.]

R.P.'s reasons for non-disclosure were clear and uncomplicated. The jury did not need expert testimony to understand them.

We discern a sufficient possibility that the admission of the CSAAS testimony led the jury to a result it might not have otherwise reached. R. 2:10-2. We, therefore, reverse and remand this matter for a new trial. In light of that decision, we need not address defendant's arguments concerning his sentence, which is vacated, but will address other arguments that may be raised again during the new trial.

Defendant claims the trial court erred in precluding defendant from introducing evidence of defendant's motive to fabricate the sexual assault allegations without opening the door to allow evidence of uncharged allegations of sexual abuse that occurred "in Florida years after the charged offenses." A pretrial agreement between the State and defense resulted in a limitation of the trial evidence to the New Jersey allegations, without mention of allegations of

21

defendant's sexual assault of R.P. in Florida. When defendant proffered his intention to introduce evidence that R.P. was alleging the New Jersey sexual assaults were made in retaliation for defendant's restrictions on R.P.'s curfew and choice of boyfriends, the trial court gave what it termed an "advisory opinion" that introduction of that evidence would open the door to "allow the State to bring in any of the sexual abuse that occurred in Florida were part of the direct testimony of [defendant] (sic)."

If the defense poses the same tactic during the retrial, and the State seeks to counter with evidence of the Florida allegations, the trial court must analyze those proofs under N.J.R.E. 404(b), which "serves as a safeguard against propensity evidence that may poison the jury against a defendant." State v. Skinner, 218 N.J. 496, 517 (2014). "Other-crimes evidence is considered highly prejudicial." State v. Vallejo, 198 N.J. 122, 133 (2009). "The underlying danger of admitting other-crime [or bad-act] evidence is that the jury may convict the defendant because he is 'a "bad" person in general.'" State v. Cofield, 127 N.J. 328, 336 (1992) (quoting State v. Gibbons, 105 N.J. 67, 77 (1987)). "For that reason, any evidence that is in the nature of prior bad acts, wrongs, or, worse, crimes by a defendant is examined cautiously because it 'has a unique tendency' to prejudice a jury." Skinner, 218 N.J. at 514 (quoting State

22

v. Reddish, 181 N.J. 553, 608 (2004)). That examination must consider the four-prong test for admissibility of other misconduct:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Cofield, 127 N.J. at 338 (quoting Abraham P. Ordover, Balancing The Presumptions Of Guilt And Innocence: Rules 404(b), 608(b), And 609(a), 38 Emory L.J. 135, 160 (1989)).]

Contrary to the State's assertion that defendant could have sought that analysis at trial, it was the State's burden to "demonstrate[] the necessity of the other-crime evidence," id. at 340, and to establish "that the probative value of the evidence is not outweighed by its apparent prejudice," Reddish, 181 N.J. at 609.

There are insufficient facts in the record, particularly that relate to the Florida acts, to allow us to conduct a de novo Cofield analysis. Even if we had those facts, the analysis is better made within "the fuller context of other information presented at trial." See id. at 610.

23

If, indeed, the door was open by defendant's proffered evidence of R.P.'s motive to fabricate, the trial court should have assayed the evidence under Cofield's test in the context of the trial evidence. That analysis must be made if the issue is presented on remand.

That remand affords defendant an opportunity to file a motion to dismiss count three of the indictment, obviating the necessity to address his argument that his trial counsel was ineffective for failing to make such motion based on the statute of limitations applicable to the crime of endangering the welfare of a child. Ineffective assistance of counsel claims are better addressed in post-conviction relief (PCR) proceedings. State v. McDonald, 211 N.J. 4, 30 (2012). That proceeding may be unnecessary if defendant files the motion on remand.

Finally, we caution the trial court that the range of dates alleged for the charged crimes—June 1, 2001 to April 30, 2002—necessitates the jury's determination if any crime subject to sentencing under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, occurred prior to June 29, 2001, the date NERA was revised to specifically include certain offenses, including aggravated sexual assault, N.J.S.A. 2C:14-2(a), and sexual assault, N.J.S.A. 2C:14-2(b) and N.J.S.A. 2C:14-2(c)(1). See N.J.S.A. 2C:43-7.2(d)(7) and (8); see also State v. Andino, 345 N.J. Super. 35, 39 (App. Div. 2001). In choosing which version

of NERA should be applied, the date of the crime controls.  State v. Johnson, 376 N.J. Super. 163, 168 (App. Div. 2005).

Under the pre-2001 version, NERA parole ineligibility could be imposed only if a defendant was convicted of a "violent crime," which, in the context of aggravated sexual assaults or sexual assaults, meant those assaults

> "in which the actor causes . . . serious bodily injury as defined in [N.J.S.A. 2C:11-1(b)], or uses or threatens the immediate use of a deadly weapon[,] . . . [or] any aggravated sexual assault or sexual assault in which the actor uses, or threatens the immediate use of, physical force." N.J.S.A. 2C:43-7.2[(d)].  Consequently, NERA covers three types of first- and second-degree sexual assaults: (1) those in which the actor causes serious bodily injury; (2) those in which the actor uses or threatens the immediate use of a deadly weapon, and (3) those in which the actor uses or threatens the immediate use of "physical force."  Those three categories are NERA factors.
>
> [State v. Thomas, 166 N.J. 560, 570-71 (2001) (first, third, fourth and fifth alterations in original).]

A jury must determine beyond a reasonable doubt if physical force beyond that inherent in the act or threat of penetration or contact.  Id. at 576-77.  That requirement conforms to the United States Supreme Court's holding:

> [A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. . . .  "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed

25

range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt."

[Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) (third alteration in original) (quoting Jones v. United States, 526 U.S. 227, 252-53 (1999) (Stevens, J., concurring)).]

As such, if the dates of the alleged acts remain as presently indicted, and the State claims NERA applies because defendant used physical force, the trial court must include a special instruction and employ a special verdict sheet so the jury can determine the date of each crime in order to ascertain which version of NERA applies. If the jury finds one or more crimes occurred prior to June 29, 2001, it must also determine, by use of special interrogatories on the verdict sheet, if defendant used or threatened the use of physical force. See State v. Marinez, 370 N.J. Super. 49, 57 (App. Div. 2004). Of course, the jury must be properly instructed as its extra duties. See In re M.T.S., 129 N.J. 422, 444-49 (1992) (defining physical force). Absent those procedures, NERA parole ineligibility cannot be imposed under the facts of this case unless the jury finds, by use of special interrogatories, that one or more crimes occurred after June 29, 2001. State v. Johnson, 166 N.J. 523, 543 (2001).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1225-17T4