**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is only binding on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2317-14T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RASHAWN BOND,

    Defendant-Appellant.

_____

Argued September 26, 2017 - Decided October 18, 2017

Before Judges Carroll, Leone and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 10-03-0288.

Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Mr. Kirsch, of counsel and on the brief).

Milton S. Leibowitz, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Thomas K. Isenhour, Acting Union County Prosecutor, attorney; Mr. Leibowitz, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

A Union County grand jury returned Indictment No. 10-03-0288, charging defendant Rashawn Bond and co-defendants Jamel Lewis, Robert Harris, and Sharif Torres with first-degree kidnapping, N.J.S.A. 2C:13-1(b) (count one); two counts of first-degree robbery, N.J.S.A. 2C:15-1(a) (counts two and four); felony murder, N.J.S.A. 2C:11-3(a)(3) (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count five); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count six); and second-degree aggravated arson, N.J.S.A. 2C:19-1(a) (count seven).

Defendant filed a severance motion seeking to be tried separately from his co-defendants. The trial court granted the motion after hearing arguments from counsel and testimony from defendant, who asserted an affirmative defense of duress. Following a jury trial, defendant was convicted of first-degree kidnapping (count one), second-degree robbery (count two),[1] felony murder (count three), and a lesser-included offense of third-degree receiving stolen property. Defendant was found not

_____

[1] The judgment of conviction (JOC) mistakenly indicates that defendant was convicted of first-degree robbery. However, the jury did not find defendant used a weapon during the robbery, and the trial judge properly recognized at sentencing that defendant was convicted of second-degree robbery. Accordingly, a remand is necessary for correction of the JOC.

guilty on the remaining counts.

At sentencing on November 20, 2014, after merging the convictions for receiving stolen property and robbery with the felony murder conviction, the judge sentenced defendant to life imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for the felony murder. The judge also imposed a concurrent thirty-year prison term on the kidnapping conviction, with an eighty-five percent period of parole ineligibility under NERA.

On appeal, defendant raises through counsel the following arguments:

> POINT I
>
> THE JURY INSTRUCTION ON DURESS DID NOT PROPERLY EXPLAIN THE BURDEN OF PROOF, AND THE INSTRUCTIONS, WHEN VIEWED AS A WHOLE, WERE, AT BEST, CONTRADICTORY ON THE STATE'S DUTY TO PROVE THE ABSENCE OF DURESS BEFORE A CONVICTION COULD BE RETURNED ON ANY COUNT; THE INSTRUCTION ON EACH INDIVIDUAL COUNT LISTED ONLY A FINDING OF THE ELEMENTS OF THE CRIME AT ISSUE, NOT THE ABSENCE OF DURESS, AS A PREREQUISITE TO A CONVICTION. (Not Raised Below)
>
> POINT II
>
> THE TRIAL COURT IMPROPERLY REFUSED TO ALLOW DEFENSE COUNSEL TO REFERENCE PRIOR CONSISTENT STATEMENTS OF DEFENDANT'S IN ORDER TO REBUT THE STATE'S REPEATED CHARGE THAT DEFENDANT WAS FABRICATING HIS TRIAL TESTIMONY.

POINT III

THE TRIAL JUDGE IMPROPERLY REFUSED TO SANITIZE DEFENDANT'S PRIOR CONVICTIONS FOR WEAPONS-POSSESSION OFFENSES UNDER <u>STATE V. BRUNSON</u>, THEREBY SUBJECTING HIM TO IMPEACHMENT REGARDING THOSE OFFENSES WHEN HE TESTIFIED, WHICH INCLUDED THE PROSECUTOR'S DECISION TO INFORM THE JURY THAT THE WEAPON IN QUESTION WAS A GUN.

POINT IV

THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE.

POINT V

THE RECENT PUBLISHED APPELLATE DIVISION DECISION IN <u>STATE V. VICTOR GONZALEZ</u> MANDATES REVERSAL OF THE DEFENDANT'S CONVICTIONS FOR THE SAME REASON AS IN THAT CASE: THE REPEATED USE OF "AND/OR" LANGUAGE IN THE ACCOMPLICE-LIABILITY JURY INSTRUCTION COULD HAVE EASILY LED TO AN IMPROPER VERDICT FROM IMPROPER JURY DELIBERATION.

In a pro se supplemental brief, defendant raises the following arguments:

POINT I

PROSECUTORIAL MISCONDUCT

A.    Knowing and Intentionally Withholding Exculpatory Discovery Pursuant to <u>Rule</u> 3:13-3 in violation of <u>Brady</u>.

B.    Prosecutor Breached Its Duty to Provide Discovery Pursuant to <u>Rule</u> 3:13-3(c)(7) Violation of Discovery <u>Rule</u> 3:13-3(b). (Not raised below)

4                                    <span>A-2317-14T3</span>

C.   Improperly Vouching for Its Key Witness' Credibility During Summation.   (Not raised below)

D.   The Prosecutor Improperly Attacked the Defendant's Credibility During Cross-Examination by Making Generic Accusations that Defendant Tailored His Trial Testimony After Being Present in the Courtroom and Hearing Prior Trial Testimony of State's Ballistics Expert Witness Michael Sandford In Violation of State v. Daniels.

E.   The Prosecutor Improperly Attacked Defendant's Credibility During Cross-Examination by Making Generic Accusations of Tailoring His Testimony to Pre-Trial Discovery.

F.   Making Improper Suggestions and Insinuations During Cross-Examination of Defendant's Key-Witness.

G.   Improperly Stated in Summation That All of Defendant's Girlfriends Testified They Felt Threatened and Intimidated by the Defendant.

POINT II

THE TRIAL COURT FAILED TO PROVIDE THE JURY WITH CURATIVE INSTRUCTION PURSUANT TO N.J.R.E. 105 IN VIOLATION OF THE DANIELS RULE.   (Not raised below)

POINT III

CUMULATIVE ERROR DENIED DEFENDANT OF A FAIR TRIAL.   (Not raised below)

For the reasons that follow, we affirm defendant's conviction.   However, we remand for resentencing and correction of the JOC.

I.

A.   The State's Case

On October 28, 2008, at 10:57 p.m., Elizabeth police found the charred, lifeless body of Tanya Worthy in a white 2005 BMW convertible that was engulfed in flames. Investigation revealed Worthy died from three gunshot wounds that were inflicted prior to the fire.

Raheem Jackson testified he was dating Worthy and lived with her in Green Brook. On October 28, 2008, Worthy left home in the BMW around 10:00 a.m. She told Jackson she was going to work and then getting something to eat. Worthy called Jackson around 5:00 p.m. from a restaurant because she was going to bring him home some food. At approximately 6:15 p.m., after she finished her meal, Worthy placed a "to-go" order. Cell phone records established that Worthy left the restaurant and drove to the Newark home of defendant, who she was also dating. Worthy never returned to the restaurant to pick up her order.

Cell phone records further revealed that: at approximately 7:30 p.m., Lewis, Harris, Torres, and Titus Lowery[2] also arrived at defendant's house; around 8:00 p.m., Lewis, Lowery, and Worthy drove toward Green Brook, where Jackson and Worthy lived; after

[2] According to the State, "Titus Lowery was an unindicted co-conspirator who died before trial."

6                                                    A-2317-14T3

defendant borrowed a car from another girlfriend, Jasmine Campbell Sykes, he drove with Harris and Torres toward Green Brook; and at approximately 8:40 p.m., Lewis, Lowery, and Worthy arrived at Worthy and Jackson's home on Thomas Court in Green Brook.

Jackson heard his garage door open and observed Worthy's car in the driveway. Jackson observed someone get out of the car wearing a hoodie and a mask. The individual pointed a handgun at Jackson and told him, "don't move." Jackson could not see the person's face or tell what type of gun he held. Jackson immediately closed the garage door and ran inside. Worthy's car drove away, and Jackson summoned the police.

Cell phone records around that time placed Lewis and Lowery near a PSE&G electrical transmission tower on Route 22 in Green Brook, across the highway from Thomas Court. Defendant, Harris, and Torres were approximately ten minutes from Thomas Court, in Watchung; and Lewis and Harris were in constant communication with each other. Lewis and Lowery drove down Route 21 to Routes 1 and 9, toward the New Jersey Turnpike.

At approximately 10:47 p.m. on October 28, 2008, the Elizabeth police and fire departments were dispatched to Neck Lane in Elizabeth, where they found Worthy's BMW convertible fully engulfed in flames. Worthy's body was in the rear passenger seat, face down, with three gunshot wounds.

Mark Chai, a retired former fire investigator and fire official for the City of Elizabeth, was called as an expert in arson investigation. He testified he responded to Neck Lane at approximately 10:58 p.m. on October 28, 2008, and participated in the processing of the BMW. Chai concluded the fire originated in the rear passenger seat and "it was set on purpose." The county medical examiner determined Worthy died from the gunshot wounds, and her body was burned after her death.

Lieutenant Michael Sandford, supervisor of the Ballistics Lab of the Union County Police Department, testified as an expert in ballistics. He explained that two projectiles were recovered from the autopsy. Both were ".38 caliber class," which meant that "both were fired from a weapon that had a caliber in the .38 caliber class, which could be anything from a .38 Short through a 9 millimeter Luger, 357 Magnum, .38 Smith & Wesson."

Cell phone records established that, after the fire was set, Lewis and Lowery drove back to Newark. Shakeerah Scott testified she had a daughter with Lewis and, on the night of Worthy's death, Lewis called her for a ride; she picked him up along with two other individuals in Newark and drove them to get Lewis's car. Sykes testified that she expected defendant to borrow her car for a couple of hours, so she began calling him around 11:00 p.m., but he did not answer. Defendant called her back sometime after

8

midnight from outside her house; he was alone and looked normal. He handed her a black leather handbag and asked if she wanted it. After defendant left, Sykes looked through the handbag and found two business cards. One was Worthy's business card from DeVry University where she worked.

In early December 2009, Detective Joe Vendas of the Union County Prosecutor's Office, Homicide Task Force, spoke with Sykes about Worthy. Vendas asked Sykes about the handbag, which in the interim she had given to her cousin. Sometime later, defendant told Sykes "if somebody comes to you, don't say nothing."

Defendant's brother, Terron Billups, testified pursuant to a plea deal and a cooperation agreement. He stated that just prior to Worthy's death, Lewis was spending time at defendant's house "every day" or "every other day or so." He also saw Harris hanging around defendant's house during that time. Both he and defendant were "affected very deeply" by the October 2007 murder of their brother, Abdul Billups.

Sean Williams also testified for the prosecution pursuant to a plea deal. Williams was an experienced car thief, who testified that during a birthday party three days before the murder, which defendant did not attend, Lewis asked him to steal a car for a "jux" (i.e., a robbery). Lewis was going to rob "one of Shawny's [i.e., defendant's] bitches" for $200,000 and he needed a fast car

for the job. Lewis told Williams that defendant was going to pay Williams for the car. Lewis did not tell Williams who was going to be involved in the robbery, or when or where it would take place. According to Williams, he refused the job because he did not want to take the risk since he had just been released from prison and his girlfriend was pregnant.

Williams stated he knew, from growing up in Newark, that the South Side Cartel was a subset of the Bloods gang and had a reputation for violence. While he and Lewis were in the Union County Jail, Lewis and other members of the South Side Cartel threatened him about his statements and testimony in this case. On February 8, 2012, he wrote a letter to Vendas, which read:

> To Detective Joe Vendas From Sean L. Williams. I am writing in regards to the recorded statement I gave to you on December 24th, '09 regarding a Mr. Jamel Lewis and Rashawn Bond. I'd like to inform you that any statement or testimony that I gave to the Union County Prosecutor's Office on December 24th, '09 is false. Any statement I, Sean Williams, made that is relative to the murder of Miss Tanya Worthy against the defendants Jamel Lewis and Rashawn Bond is false.

Williams claimed he wrote the letter at "a time when I was gettin' threatened again."

Vendas testified he was present at defendant's house on January 16, 2009, when defendant was arrested on federal drug charges. While there, he seized defendant's cell phone, which was

in plain view. That day, defendant received a phone call from Torres's phone, although Vendas did not know what the call was about.

Vendas interviewed defendant that same day. Defendant denied any involvement in the murder of Worthy, and initially denied knowing her. The interview was recorded and played for the jury.

Vendas admitted the State had no evidence that defendant was in Worthy's BMW or at her home the evening she was murdered. While there was evidence that defendant picked up Sykes's car in Hillside at approximately 8:30 p.m. that evening, Vendas admitted it would have been very difficult, if not impossible, to drive from her house in Hillside to Green Brook in approximately twenty minutes. He acknowledged that although Williams testified he had been recruited by Lewis to steal a car for the robbery, the car that was recovered from Hansbury and Elizabeth Avenues in Newark on the night of the murder, which defendant had allegedly driven and abandoned, was stolen "well before" Lewis spoke with Williams. Also, although Sykes testified she picked up defendant and only one other person, Vendas conceded that the cell phone records demonstrated that both Harris and Torres were with defendant at the time.

Vendas's handwritten notes of his "pre-interview" with Williams, dated December 17, 2009, were produced to the defense

11

during the trial. Vendas testified he forgot he took those notes. He wrote down that Williams told him that "Broke," meaning Lewis, was associated with the 793 Bloods gang, which had an affiliation with the South Side Cartel. Williams also told him Lewis carried a .357 revolver, which was consistent with the caliber of bullets that killed Worthy; that "Broke and Dubird did Hinnant," i.e., that Lewis and Billups killed Jermaine Hinnant; and that somebody named "Farad" killed defendant's brother Abdul Billups.

B. Defendant's Case

Defendant testified at trial. He did not dispute much of the State's case; rather, he claimed he acted under duress.

According to defendant, his brother Abdul had been a member of the South Side Cartel, a gang with a reputation for violence and killing people "they think are snitches or cooperating against them[.]" Lewis was defendant's cousin and belonged to the 793 gang, which was affiliated with the South Side Cartel. Abdul was murdered in October 2007. About two weeks later, Lewis told defendant "don't be mad at me, but your brother had to go, we couldn't take no chances of taking us all down." Lewis also said he murdered defendant's friend of thirty years, Jermaine Hinnant, in February 2007, because Hinnant gave a statement to police about Lewis.

Defendant did not associate with Lewis prior to Abdul's death,

but afterwards Lewis frequently came to his house. Defendant did not want Lewis around, but was scared to tell him to leave.

In September 2008, Lewis suggested they rob Worthy and her drug-dealer boyfriend, Jackson, who Lewis suspected kept a large amount of cash in his home. Defendant did not want to get involved, but he did not refuse because "[t]hat's like committing suicide, man. You know, you just don't tell a person like that."

Defendant pretended to call Worthy three or four times so Lewis would leave him alone. However, Lewis persisted, and on October 19 or 20, 2008, Lewis forced defendant to call Worthy from his phone, "[b]ecause he thought I was bullshitting." Lewis pulled out a .357 handgun, put it on his lap, and said "man, don't be stupid like your brother, . . . don't make me kill you, call her." Defendant called Worthy from Lewis's phone because "I was afraid of him."

Lewis repeatedly told defendant they were not going to hurt Worthy. Lewis's plan was to have Worthy come to defendant's house, pretend he was robbing defendant, take Worthy to Green Brook, and have defendant follow in a stolen car. He told defendant that his friends Lowery, Harris, and Torres were also going be involved. Lowery, Harris, and Torres called themselves "B-Block," and all had reputations for violence.

Defendant testified he "just went along with it" because

Lewis threatened to kill him if he did not participate. Also, Lewis never asked him to pay Williams for a stolen car. Defendant explained that Lewis was a car thief himself, and would not need Williams to steal a car for them.

On October 27, 2008, defendant called Worthy several times from Lewis's phone to see if she would come to his house, but she was not available that day. At Lewis's request, defendant picked up Lowery, Torres, and Harris in Philadelphia and drove back to Newark.

The next day, Worthy began calling Lewis's phone, since defendant had called her from that phone and told her it was his new phone number. Lewis did not answer the calls and told Lowery to have defendant call Worthy using Lowery's phone so Lowery could monitor the conversation. Defendant called Worthy, and she agreed to come to his home.

At approximately 5:00 p.m., Lewis went to defendant's house and picked up Harris and Torres, but left Lowery to ensure defendant did not contact Worthy, who arrived there around 6:45 p.m. At approximately 7:15 p.m., defendant and Worthy went outside to Worthy's car. Lewis, Lowery, Harris, and Torres "came out from the garage with two weapons" and forced them back into the house. Harris and Torres took defendant into another room and pretended to rob him. Lewis and Lowery initially took Worthy into

defendant's bedroom, and shortly thereafter they left the house with Worthy and drove off in her car toward Green Brook.

Defendant went into his bedroom, where he picked up Worthy's "pocketbook and stuff." Defendant, Torres, and Harris then drove "the stolen car" to Hansbury and Elizabeth Avenues in Newark, where defendant left the car and called Sykes to pick them up. After dropping Sykes off at her house and giving her Worthy's pocketbook, defendant intentionally drove the opposite direction on Route 22 because he did not want to participate in the robbery. Meanwhile, Lewis kept calling Harris from Green Brook to find out where they were. Harris had one of Worthy's cell phones, which he discarded while they drove on Route 78.

Shortly after 8:49 p.m., Lewis called Harris and said, "fuck it, it's over with, everythin' over with, fuck it." Defendant turned the car around and headed back toward Newark to meet Lewis. When they met on Route 78, Lewis was driving Worthy's car, and he instructed defendant to follow him. Lewis then stopped at a gas station and purchased a five-gallon can of gasoline. Defendant was able to see Lowery in the car but could not see Worthy.

Lewis drove to an area near the Budweiser brewery, where he set Worthy's car on fire. Lewis and Lowery then got into Sykes's car. While defendant was driving, Lewis put a .357 handgun to the back of his head and said, "I should blow your fucking head off,

where the fucking car at, where the stolen car, where the car at, you fucked up everything, why the fuck you ain't follow me out here." Defendant stated he felt nervous and scared.

Defendant drove back to Newark to retrieve the stolen car, which was not there because the police had already picked it up. Lewis became angry and yelled at defendant that he should have killed him. Lewis also stated, "I did all this shit for nothin', I had to kill some fucking body for nothin', I didn't get nothin' out of it." It was at this point that defendant realized Lewis had killed Worthy. Harris and Torres stayed at defendant's home that evening, and the next day defendant drove them back to Philadelphia.

Defendant did not report Lewis to the police for the murder of Worthy because he feared recrimination from Lewis and the South Side Cartel. He admitted he lied to Vendas during his January 16, 2009 interview for the same reason.

Newark Police Officer Derrick Clemons testified he responded to Hansbury Avenue on a report of a stolen car shortly after 11:00 p.m. on October 28, 2008. He observed the front windshield was cracked and there was some ignition and steering column damage, "which is pretty common with a vehicle being stolen," and the keys were in the ignition. The vehicle was stolen in New York City sometime between September 30, 2008, and October 2, 2008, and the

16

theft was reported on October 3, 2008.

## II.

We first address defendant's arguments, raised for the first time on appeal, that the jury instructions on duress and accomplice liability were improper. We begin by noting that when a defendant fails to object to a jury charge at trial, we review for plain error, and "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2). Plain error, in the context of a jury charge, is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Camacho, 218 N.J. 533, 554 (2014) (alteration in original) (quoting State v. Adams, 194 N.J. 186, 207 (2008)).

Of course, in reviewing any claim of error relating to a jury charge, "[t]he charge must be read as a whole in determining whether there was any error[,]" State v. Torres, 183 N.J. 554, 564 (2005), and the effect of any error must be considered "in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (quoting State v. Chapland, 187 N.J. 275, 289

17

(2006)).  However, a defendant's attorney's failure to object to jury instructions not only "gives rise to a presumption that he did not view [the charge] as prejudicial to his client's case[,]" State v. McGraw, 129 N.J. 68, 80 (1992), but is also "considered a waiver to object to the instruction on appeal."  State v. Maloney, 216 N.J. 91, 104 (2013).

A.

In Point I of his counselled brief, defendant contends the court committed plain error in its jury instruction on duress.  He argues that the court's failures to "properly explain the burden of proof with respect to duress, and to properly integrate the concept of duress into the individual instructions on each of the crimes charged, both individually and collectively denied [him] the thorough and complete jury instructions, and jury deliberations, to which he was entitled."

N.J.S.A. 2C:2-9, "Duress," provides in relevant part:

> (a). . . . it is an affirmative defense that
> the actor engaged in the conduct charged to
> constitute an offense because he was coerced
> to do so by the use of, or a threat to use,
> unlawful force against his person or the
> person of another, which a person of
> reasonable firmness in his situation would
> have been unable to resist.

Although a defendant initially must produce some evidence tending to establish the affirmative defense of duress, the State must

disprove the defense beyond a reasonable doubt.  State v. B.H.,

183 N.J. 171, 187-88 (2005); State v. Romano, 355 N.J. Super. 21,

35-36 (App. Div. 2002).

The trial judge charged the jury on the affirmative defense

of duress in accordance with Model Jury Charge (Criminal), "Duress

(N.J.S.A. 2C:2-9)" (May 5, 1982).  In relevant part, the charge

provided:

> Now, in defense of the charge of robbery and
> kidnapping of Tanya Worthy and/or the robbery
> of Raheem Jackson and/or the arson of Tanya
> Worthy's vehicle and/or the weapons counts,
> the defendant contends that he is not guilty
> because at the time of the offense, he acted
> under duress.  In other words, he was coerced
> to commit the offense due to the use of, or a
> threat to use, unlawful force against him or
> another person.
>
> . . . .
>
> Before conduct, which would otherwise be
> criminal, can be excused on the ground that
> such conduct was a direct result of force or
> threats of force upon the defendant or
> another, the evidence must indicate that the
> following conditions existed at the time:
>
> (1)  That there was use of, or threatened use
> of, unlawful force against the person of the
> defendant or another; and
>
> (2)  That the force, or threatened force,
> would be of such a type that a person of
> reasonable firmness in a similar situation
> would have been unable to resist.
>
> . . . .

> The State has the burden to prove beyond a reasonable doubt each element of those offenses, robbery and kidnapping, and all the elements of every charge in the indictment. If you find that the defendant acted under duress in the commission of either the robbery charges or the kidnapping charges, then in that event, he may not be found guilty of felony murder.
>
> The State also has the burden to disprove beyond a reasonable doubt the defense of duress. If you find that the State has proven beyond a reasonable doubt each element of the offenses charged and that the State has disproved beyond a reasonable doubt the defense of duress, you must find the defendant guilty. If, however, you determine that the State has failed to prove beyond a reasonable doubt one or more elements of the charges of robbery, kidnapping, arson or the weapons counts, or has failed to disprove the defense of duress, you must find him not guilty.

Defendant now contends the model charge includes the preliminary legal decision reserved for the judge as to whether there is sufficient evidence to support the defense at all. He argues that, as a result, the model charge "badly commingles the judge's job of determining the sufficiency of [] defendant's proofs of duress — i.e., whether there is merely evidence sufficient to instruct the jury on the defense — with the jury's job of determining whether the State has disproved the defense beyond a reasonable doubt." Defendant contends the duress charge should mirror Model Jury Charge (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter" (Revised June 8, 2015),

20                                                    A-2317-14T3

which defines the elements of the defense in conjunction with the State's obligation to disprove at least one of them beyond a reasonable doubt. Defendant also argues the judge did not make clear that the defense applied to all counts of the indictment. We find these arguments unpersuasive.

The model charge on duress informs the jury of those factors that make the defense available in the first instance, as well as those factors that make the defense unavailable. The charge does not imply that a defendant has any burden of proof and clearly tells the jury that the State bears the burden of disproving the elements of the defense beyond a reasonable doubt. We see no reason to adapt the model charge on duress to the format used in the model charge on passion/provocation manslaughter, which ultimately asks the jury to consider the factual underpinnings of that defense, albeit later in the charge. As the Court has said,

> insofar as consistent with and modified to meet the facts adduced at trial, model jury charges should be followed and read in their entirety to the jury. The process by which model jury charges are adopted in this State is comprehensive and thorough; our model jury charges are reviewed and refined by experienced jurists and lawyers.
>
> [State v. R.B., 183 N.J. 308, 325 (2005).]

Defendant's other claim, that the charge did not make clear to the jurors they were to consider duress as to all counts of the

21

indictment, lacks sufficient merit to warrant extensive discussion. R. 2:11-3(e)(2). The judge listed all the charges against defendant to which duress could provide a defense, and clearly told the jury that, in addition to the burden to prove beyond a reasonable doubt each element of each substantive offense, the State also bore "the burden to disprove beyond a reasonable doubt the defense of duress."

B.

Relying on State v. Gonzalez, 444 N.J. Super. 62 (App. Div.), certif. denied, 226 N.J. 209 (2016), defendant contends for the first time on appeal in Point V of his counselled brief that the accomplice liability charge was plainly erroneous because the court's repeated use of the phrase "and/or" could have confused the jury and led to an improper verdict. He argues that, as in Gonzalez, the instruction "improperly allows the jury to conclude that [he] is liable for crimes committed by the principal as long as he aided or abetted one of those crimes." Alternatively, "different jurors could conclude that defendant aided or abetted different crimes and find accomplice liability for all of those crimes, or all of the crimes committed by the principal." In the context of the present case, we disagree.

In Gonzalez, the defendant was charged as a co-conspirator and accomplice with robbery and three counts of aggravated assault.

22                                          A-2317-14T3

*Id.* at 73. He testified that he was at the scene of the fatal shooting with two co-defendants, but that his participation was the product of duress. *Ibid.* The panel criticized the use of the imprecise "phrase 'and/or[.]'" *Id.* at 71. It found error in the jury charge on conspiracy and accomplice liability because the charge referred to "robbery and/or aggravated assault" when referring to the substantive crimes the co-defendants were alleged to have committed for which the defendant was to be considered accountable. *Id.* at 73-75. The panel explained the critical flaw in the charge as follows:

> [T]he nature of the indictment required that the jury decide whether defendant conspired in or was an accomplice in the commission of a robbery, or an aggravated assault, or both. By joining (or disjoining) those considerations with "and/or" the judge conveyed to the jury that it could find defendant guilty of either substantive offense — which is accurate — but left open the possibility that some jurors could have found defendant conspired in or was an accomplice in the robbery but not the assault, while other jurors could have found he conspired in or was an accomplice in the assault but not the robbery. In short, these instructions did not necessarily require that the jury unanimously conclude that defendant conspired to commit or was an accomplice in the same crime. Such a verdict cannot stand.
>
> The jury was also told that "to find the defendant guilty of committing the crimes of robbery and/or aggravated assault charges, the State must prove [among other things] that [the co-defendant] committed the crimes of

robbery and/or aggravated assault." Assuming the "and/or" in this instruction was interpreted as being a disjunctive, it is entirely possible the jury could have convicted defendant of both robbery and aggravated assault even if it found [the co-defendant] committed only one of those offenses, i.e., the jury was authorized, if it interpreted "and/or" in this instance as "or," to find defendant guilty of robbery because it was satisfied the State proved that [the co-defendant] committed an aggravated assault.

[Id. at 75-77 (citations omitted).]

In denying certification, the Supreme Court expressly limited the panel's holding "to the circumstances in which it was used in th[at] case." Gonzalez, supra, 226 N.J. at 209.

In the present case, the judge charged the jury on accomplice liability in accordance with Model Jury Charge (Criminal), "Liability for Another's Conduct (N.J.S.A. 2C:2-6) Accomplice" (Revised 5/22/95):[3]

In the alternative, the State alleges that the defendant is legally responsible for the criminal conduct of Jamel Lewis, Robert Harris and Sharif Torres in violation of the law, which reads in pertinent part as follows:

A person is guilty of an offense if it is committed by his own conduct or the conduct of another person for which he is legally accountable or both. A person is legally accountable for the conduct of another when

---

[3] This model jury charge, prior to the judge tailoring the charge to the specific facts of the case, uses the phrase "and/or" five times.

he is an accomplice of such other person in the commission of an offense. A person is an accomplice of another in the commission of an offense if, with the purpose of promoting or facilitating the commission of the offense, he (a) solicits such other person to commit it, and/or (b) aids or agrees or attempts to aid such other person in planning or committing it.

This provision of the law means that not only is the person who actually commits the criminal act responsible for it, but one who is legally accountable as an accomplice is also responsible as if he committed the crime himself.

In this case, the State alleges that the defendant is guilty of the crimes committed by Jamel Lewis, Robert Harris and Sharif Torres because he acted as his or their accomplice. In order to find the defendant guilty as an accomplice, the State must prove beyond a reasonable doubt each of the following elements: (1) That Jamel Lewis, Robert Harris, and/or Sharif Torres committed the crimes of robbery and kidnapping of Tanya Worthy and/or robbery of Raheem Jackson, and/or the arson of Ms. Worthy's vehicle; . . . . (2) That this defendant solicited them or one of them to commit them, and/or did aid or agree or attempt to aid him or them in planning or committing the offenses; (3) That this defendant's purpose was to promote or facilitate the commission of the offenses; (4) That this defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the act.

    . . . .

If you find that the defendant, with the purpose of promoting or facilitating the commission of the offenses of robbery and/or

25

kidnapping, and/or arson, solicited Jamel Lewis, Robert Harris, and/or Sharif Torres to commit it or them, and/or aided or agreed or attempted to aid him or them in planning or committing them, then you should consider him as if he committed the crimes himself. The defendant's status as an accomplice must be considered separately as to each charge.

. . . .

In order to convict the defendant as an accomplice to the crimes charged, you must find that the defendant had the purpose to participate in those particular crimes. He must act with the purpose of promoting or facilitating the commission of the substantive crimes with which he is charged.

It is not sufficient to prove only that the defendant had knowledge that another person was going to commit the crimes charged. The State must prove that it was the defendant's conscious object that the specific conduct charged be committed. In sum, in order to find the defendant guilty as an accomplice of committing the crimes of robbery and kidnapping of Tanya Worthy and/or the robbery of Raheem Jackson, and/or the arson of Tanya Worthy's vehicle, the State must prove each of the following elements beyond a reasonable doubt: (1) That Jamel Lewis and/or Robert Harris and/or Sharif Torres committed the crimes of robbery and/or kidnapping of Tanya Worthy and/or the robbery of Raheem Jackson and/or the arson of Tanya Worthy's vehicle; (2) That this defendant's purpose was to promote or facilitate the commission of those offenses; (3) That this defendant solicited him or any one of them to commit them and/or did aid or agree or attempt to aid them or any one of them in planning or committing them; (4) That this defendant possessed the criminal state of mind that is required to be proved

against the person who actually committed the criminal act.

Again, you are reminded that you must consider the defendant's accomplice status separately as to each charge. So, you first have to go through the facts as you find them on the charge of Count One of the indictment, which is the kidnapping charge. Was the kidnapping charge committed by any one of them in the indictment. First you're going to look at him as a principal, whether he was involved as a principal, and then you'll look at his accomplice status. Was the crime committed. Did he participate in that. Did he agree, was that his purpose to have it done with any one of the people [] you find committed those offenses. And you have to do that with respect to each charge in the indictment[.]

Now, if you find that the State has proved each and every one of the elements that I have explained to you beyond a reasonable doubt, then you must find the defendant guilty. If, on the other hand, you find that the State has failed to prove one or more of these elements beyond a reasonable doubt, then you must find the defendant not guilty.

[(Emphasis added).]

The court next reiterated the State's burden of proof and the requirement that the jury's verdict must be unanimous. It then provided the duress charge and defined the elements of each offense charged.

We acknowledge that the court's accomplice liability charge is markedly similar to that which the panel found unduly ambiguous and hence defective in Gonzalez. Nonetheless, under the facts

27                                                          A-2317-14T3

presented, we conclude defendant has not carried his burden to show that usage of the phrase "and/or" was "clearly capable of producing an unjust result." R. 2:10-2.

Here, in its accomplice liability instruction, the court used "and/or" three ways. First, the court instructed that the jury must find that "defendant solicited [another defendant] to commit [the crime] and/or did aid or agreed or attempted to aid [the other defendant] in planning or committing [the crime.]" This comports with the model charge, and is a correct recitation of the law because either solicitation or aiding or both is sufficient to establish accomplice liability.

Second, the instruction referenced the other defendants committing "the crimes of robbery and kidnapping of Tanya Worthy and/or the robbery of Raheem Jackson, and/or the arson of Tanya Worthy's vehicle[.]" The use of "and/or" regarding multiple crimes similarly occurred in Gonzalez, where the defendant was convicted on all counts. Gonzalez, supra, 444 N.J. Super. at 68. Here, however, defendant was acquitted of robbing Jackson, the arson of Worthy's car, and the weapons offenses. Hence, there is no reason to believe the jury convicted defendant of the kidnapping and robbery of Worthy based on any of those other crimes. Regarding the court's instruction to consider whether defendant was an accomplice in the "robbery and/or kidnapping of Tanya Worthy," we

expect that the jury followed the court's repeated instructions that "[t]he defendant's status as an accomplice must be considered separately as to each charge." See State v. Miller, 205 N.J. 109, 126 (2011). Further, the court went on to illustrate that admonition by explaining how the jury could convict defendant of kidnapping as an accomplice only if one of the other defendants committed "the kidnapping charge" and if defendant participated in or agreed to the kidnapping, adding, "[a]nd you have to do that with respect to each charge in the indictment."

Third, the court told the jury it had to find that "Jamel Lewis, Robert Harris, and/or Sharif Torres" committed a crime, and that defendant solicited "them or one of them" or aided "him or them." It is implausible the jury would convict defendant as an accomplice if, e.g., Lewis and Harris committed the crime but defendant aided Torres who did nothing. Moreover, according to defendant, Lewis, Harris, and Torres together carried out the kidnapping and robbery of Worthy. Thus, given the facts of this case and the testimony at trial, defendant has not shown that the judge's use of "and/or" in the context of the entire charge led to an "ultimate determination of guilt or innocence . . . based on speculation, misunderstanding, or confusion." State v. Olivio, 123 N.J. 550, 568 (1991). Accordingly, we find no plain error in the jury instruction.

29

III.

In Point II of his counselled brief, defendant contends the court erred by refusing to admit his prior consistent statements to rebut the State's argument that he fabricated his duress defense. We disagree.

On January 16, 2009, defendant gave a recorded statement to Vendas in which he denied any involvement in the kidnapping, robbery, and murder of Worthy. On November 15, 2012, defendant testified at the hearing on the severance motion that he was involved in those crimes; however, he acted under duress, as he was afraid that Lewis or other members of the South Side Cartel would kill him if he did not participate.

At trial, defense counsel sought to cross-examine Vendas about unrecorded statements defendant made to federal authorities in May and June, 2009, which were allegedly consistent with his duress defense. Vendas was present when defendant made those statements. The trial judge conducted a N.J.R.E. 104 hearing outside the presence of the jury, and concluded that the proposed cross-examination was improper because the State had not yet made a claim of "recent fabrication," and because there was some confusion as to what was said by defendant, since there were no recordings.

30                                                                A-2317-14T3

Defense counsel attempted to question defendant about his alleged statements to federal authorities on his direct examination. The judge sustained the State's objection, again finding the questioning premature. During cross-examination, the State highlighted the discrepancies between defendant's trial testimony, his 2009 recorded statement, and his testimony at the hearing on the 2012 severance motion. On redirect, defense counsel once more sought to elicit testimony about defendant's alleged prior consistent statements to federal authorities. The judge sustained the State's objection, finding the State had not alleged recent fabrication or improper influence on the issue of duress. Defendant challenges these evidentiary rulings on appeal.

"The general rule as to the admission or exclusion of evidence is that '[c]onsiderable latitude is afforded a trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion.'" State v. Kuropchak, 221 N.J. 368, 385 (2015) (quoting State v. Feaster, 156 N.J. 1, 82 (1998), cert. denied, 532 U.S. 932, 121 S. Ct. 1380, 149 L. Ed. 2d 306 (2001)). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'" Ibid. (quoting State v. Marerro, 148 N.J. 469, 484 (1997)).

Generally, "[a] prior consistent statement offered to bolster a witness' testimony is inadmissible." Palmisano v. Pear, 306 N.J. Super. 395, 402 (App. Div. 1997); see also State v. Gomez, 246 N.J. Super. 209, 223 (App. Div. 1991). "However, a prior statement may be admitted in evidence to support the credibility of a witness for the purpose of rebutting an expressed or implied charge of recent fabrication." Palmisano, supra, 306 N.J. Super. at 402.

N.J.R.E. 607 provides, in relevant part: "A prior consistent statement shall not be admitted to support the credibility of a witness except to rebut an express or implied charge against the witness of recent fabrication or of improper influence or motive and except as otherwise provided by the law of evidence." Additionally, N.J.R.E. 803(a)(2) excludes from hearsay the prior statement of a witness that "is consistent with the witness' testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive[.]"

Here, while it is certainly true that the State used defendant's January 2009 statement and 2012 testimony to impeach his credibility, it did not allege that his claim of duress was a recent fabrication. On cross-examination, the prosecutor did not adduce any evidence, express or implied, of a recent falsehood or

32

change in defendant's testimony about his duress defense. Rather, the prosecutor highlighted defendant's admitted lies (that he did not have a relationship with Worthy and was not involved in her kidnapping, robbery, and murder), and other inconsistencies, to demonstrate his testimony was not credible. Since there was no claim of recent fabrication, the trial court properly barred the use of defendant's alleged prior consistent statements.

Additionally, defendant cannot show prejudice. Prior consistent statements are most probative if they predate the motive to fabricate. State v. Moorer, 448 N.J. Super. 94, 110-11 (App. Div. 2017). The State did not allege and defendant has not shown that his alleged statements to federal authorities in May and June 2009 predated defendant having a motive to fabricate concerning the crimes; indeed, defendant was admittedly fabricating to avoid liability for the crimes as early as January 2009. Moreover, defendant was able to use his 2012 testimony to show that he had testified similarly then and in his trial testimony. Defendant has not identified any alleged statements to federal authorities in 2009 that were consistent with his trial testimony but unmentioned in his 2012 testimony.[4]

---

[4] For example, defendant does not allege his 2009 statements to federal authorities mentioned Lewis's alleged possession of a .357 caliber gun, the tattoo, or the nicknames which we discuss in Section IV.

In a somewhat similar vein, defendant in his pro se supplemental brief contends the State improperly attacked his credibility by accusing him of tailoring his testimony, in violation of State v. Daniels, 182 N.J. 80 (2004). He further contends the trial court compounded this error by failing to provide the jury with an appropriate curative instruction.

"[A] criminal defendant has the right to be present at trial," "to be confronted with the witnesses against him and to hear the State's evidence," "to present witnesses and evidence in his defense," and "to testify on his own behalf[.]" Id. at 97 (citations omitted). "Prosecutorial comment suggesting that a defendant tailored his testimony inverts those rights, permitting the prosecutor to punish the defendant for exercising that which the Constitution guarantees." Id. at 98. Such comments "undermine the core principle of our criminal justice system--that a defendant is entitled to a fair trial." Ibid.

"Allegations of tailoring are specific when there is evidence in the record, which the prosecutor can identify, that supports an inference of tailoring." Ibid. While generic accusations of tailoring are prohibited, specific accusations are permitted in a limited fashion. Id. at 98-99. In order to comment on, or cross-examine a defendant about, specific accusations of tailoring,

there must be "evidence of tailoring, beyond the fact that the defendant was simply present at the trial and heard the testimony of other witnesses[.]" Ibid. The comments or questions "must be based on the evidence in the record and the reasonable inferences drawn therefrom." Id. at 99. "Moreover, the prosecutor may not refer explicitly to the fact that the defendant was in the courtroom or that he heard the testimony of other witnesses, and was thus able to tailor his testimony." Ibid.

A curative instruction must be immediate and specific in order to alleviate potential prejudice from inadmissible evidence and its substance must be adequate. State v. Vallejo, 198 N.J. 122, 134-35 (2009). If a party fails to request such an instruction, the decision is reviewed under the plain error standard as to whether it was "clearly capable of producing an unjust result." R. 2:10-2; State v. Macon, 57 N.J. 325, 337 (1971). "If the defendant does not object to [a] [curative instruction] at the time it is given, there is a presumption that the [curative instruction] was not error and was unlikely to prejudice the defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012). It is with these principles in mind that we examine defendant's claims of error.

## A.

In Point I(D) of his pro se supplemental brief, defendant

argues that the prosecutor committed misconduct by accusing him of tailoring his testimony and thereby violated Daniels. Specifically, he contends the prosecutor improperly attacked his credibility by making "generic" accusations of tailoring his testimony after hearing the testimony of the State's ballistics expert, Lt. Sandford. In Point II of his pro se brief, defendant contends for the first time that the trial court erred in failing to provide the jury with an appropriate curative instruction.

In reviewing alleged acts of prosecutorial misconduct, we inquire whether the conduct "was so egregious that it deprived the defendant of a fair trial." State v. Frost, 158 N.J. 76, 83 (1999); State v. Loftin, 146 N.J. 295, 386 (1996). In determining whether a defendant's right to a fair trial has been denied, we consider several factors, such as whether the defense counsel made a timely objection, whether the prosecution promptly withdrew the improper remark, whether the trial judge ordered that the improper remark be stricken, and whether the trial judge instructed the jury to disregard the improper remark. Ibid. "To justify reversal, the prosecutor's conduct must have been 'clearly and unmistakably improper,' and must have substantially prejudiced the defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Timmendequas, 161 N.J. 515, 575 (1999), cert. denied, 534 U.S. 858, 122 S. Ct. 136, 151 L. Ed. 2d

89 (2001).

At trial, defendant testified he "read through all the discovery," but denied looking at the ballistics report. Subsequently, the following colloquy between the prosecutor and defendant occurred:

> Q.   Nowhere in [the transcript of the pre-trial severance hearing] do you say anything about Jamel Lewis having a .357 gun in his lap; is that right?
>
> A.   No, it's nowhere in there.
>
> Q.   So, at no time in November of 2012, when you gave previous testimony, did you say anything about that; is that right?
>
> A.   No.
>
> Q.   That was new for this trial; is that right?
>
> A.   Yes, but it happened.
>
> Q.   Okay.  And that's after you've had the opportunity to look at everything; correct?
>
> A.   No.
>
> Q.   And you've heard testimony about the ballistics report; right?
>
> A.   Yes.
>
> Q.   You heard Lieutenant Sandford come in and testify about the ballistics report in this case?
>
> A.   Yes.

Q.   And you testified that the bullets that were found in Ms. Worthy were consistent with a .357; is that right?

A.   Yes.

Q.   And you heard about that, and you heard your lawyer asking questions about a .357; correct?

A.   I heard that, yes.

Q.   So, for the first time last week and today, you come up with two instances . . . where you say that Jamel Lewis threatened you with a .357; correct?

        . . . .

Q.   And you talk about a []9 millimeter and a .45; correct?

A.   Yes.

Q.   So, you did talk about guns with Jamel Lewis when you testified back in 2012?

A.   Yes.

Q.   But never about a .357; is that right?

A.   Yes.

Q.   And you never said anything in 2012 about Jamel Lewis pointing a gun at your head and saying he should kill you; did you?

A.   No, I didn't.  Yes, I did, in, um -- right after the murder, I said that.  He put --

Q.   That he pointed a gun at your head in the car, after you got into the car?

A.   Yes, I believe so, in the statement.

[(Emphasis added).]

Defendant did not object to this questioning or request a curative instruction. Nor did the court sua sponte provide a specific curative instruction. Rather, it provided essentially the same "generic jury instruction" that the Court in Daniels, supra, 182 N.J. at 101-02, determined was insufficient to cure the prosecutor's impropriety.

The prosecutor's allegations of tailoring here were specific, not generic. The prosecutor specifically pointed out the differences between defendant's trial testimony and his prior testimony, which supported an inference of tailoring. See id. at 98. Thus, the cross-examination was based on the evidence in the record and the reasonable inferences drawn therefrom. Id. at 99; State v. Swint, 328 N.J. Super. 236, 261 (App. Div.), certif. denied, 165 N.J. 492 (2000).

However, while the prosecutor had "reasonable grounds" for posing questions during cross-examination that impugned defendant's credibility, she improperly referenced his attendance at trial and his ability to hear Sandford's testimony. That portion of the cross-examination was in direct violation of Daniels. Id. at 99-101 ("[A]t no time during cross-examination may the prosecutor reference the defendant's attendance at trial or his ability to hear the testimony of preceding witnesses.");

State v. Feal, 194 N.J. 293, 308 (2008) (noting Daniels established a bright-line rule). Such comments and questions "are precisely the type that a prosecutor is prohibited from making, even when the record indicates that defendant tailored his testimony." Daniels, supra, 182 N.J. at 101.

Nonetheless, in the context of this case, defendant has not shown the prosecutor's brief reference to defendant having heard Sandford's ballistics testimony was plain error, nor was the court's failure to provide the jury with a more specific curative instruction. The prosecutor's improper reference did not cause the jury to believe that defendant rather than Lewis possessed the handgun. Rather, the jury acquitted defendant of the weapons offenses, and found the State failed to prove he was armed with a deadly weapon during the robbery of Worthy. See Feal, supra, 194 N.J. at 313 (finding no plain error from "the prosecutor's fleeting references" in closing that the defendant changed his story "after hearing all the witnesses testify"). Defendant has thus failed to establish that the prosecutor's remark "substantially prejudiced [his] fundamental right to have a jury fairly evaluate the merits of his defense." Timmendequas, supra, 161 N.J. at 575.

B.

In Point I(E) of his pro se supplemental brief, defendant advances the additional claim that, on cross-examination, the

prosecutor committed misconduct by making "generic" accusations that he tailored his testimony to the pre-trial discovery. Again, we are not persuaded.

Defendant cites three accusations of tailoring he asserts were "generic" and therefore improper. The first relates to questions posed by the prosecutor about his brother, Abdul, having a South Side Cartel tattoo:

> Q. Now, in 2012, you also gave testimony about the South Side Cartel; correct?
>
> A. Yes, ma'am.
>
> Q. And you gave testimony about Amin Roland; is that right?
>
> A. Yes.
>
> Q. And then [defense counsel], while you were in court this time, asked you some more questions about the South Side Cartel; isn't that true?
>
> A. Yes, ma'am.
>
> Q. When you testified in 2012, you said not a word about tattoos; correct?
>
> A. Uh --
>
> Q. You didn't say anything about your brother having a South Side Cartel tattoo; right?
>
> A. That question wasn't asked. That question wasn't asked.
>
> Q. But after you got the packet in discovery with the South Side Cartel tattoo, then you

41

testified in court here today -- or last week about the South Side Cartel tattoo; correct?

A.   Excuse me.  I can't answer that question with a yes or no.

Q.   Okay, that's fine.  Then you can't answer my questions.

The second instance relates to questions about gang member Lawrence "Larry" Parks:

Q.   And one of the things you testified to before this jury is that Jamel Lewis was best friends with Lawrence Parks; is that right?

A.   Yes.

Q.   And then you were asked right after that, by [defense counsel], did you get as part of discovery in the trial pictures of members of the South Side Cartel; correct?

A.   Yes.

Q.   And that you had the opportunity to look at those pictures; right?

A.   Yes.

Q.   And one of those pictures in the chart that you got was Larry Parks; correct?

A.   It was more than Larry Parks, yes.

Q.   Yes, but one of the pictures --

A.   Yes.

Q.   -- was Larry Parks; correct?

A.   Yes.

42

Q. And you didn't get that chart when you testified in November of 2012; correct?

A. No.

Q. Name me one time, Mr. Bond, in 2012 when you even mentioned the name of Larry Parks.

. . . .

A. I can't answer that yes or no, judge.

. . . .

Q. Well, isn't it fair to say that not once does Larry Parks' name come up?

A. I can't answer that yes or no.

Q. Okay. Why can't you answer it?

. . . .

A. Because of the simple fact that during my duress hearing, it wasn't based on the South Side Cartel. Only thing my duress hearing was . . . to show enough for me to get a separate trial from the rest of my three codefendants. It wasn't in depth for me to go into all these other details[.]

The final instance relates to questions about gang members' nicknames:

Q. Okay. And another thing you never mentioned in November of 2012, you never mention that Farad Roland's nickname was BU; correct?

A. No.
Q. And that was part of that chart; correct?

A. I grew up with all these guys, so, I mean --

43

Q. And you never mention that Amin Roland's nickname was Crack; correct?

A. No.

Q. But that was part of the chart that you got before trial; right?

A. Yes.

Q. And you never mentioned that Larry Parks' nickname was Big L; correct?

A. Yes.

Q. Because you never mentioned Larry Parks at all; right? So, that was something new that you testified during the trial; correct?

. . . .

A. I can't answer that.

Defendant contends all three of the above-referenced instances were improper "generic" accusations of tailoring his testimony to the pre-trial discovery. He asserts "there were no legitimate grounds for which the prosecutor could infer [he] was tailoring his testimony; other than to attack his credibility." He further posits: "[t]he so-called inconsistencies relied upon by the State simply did not exist and the State's inference that [he] had tailored his testimony was patently unfair and deprive[d] [him] of a fair trial."

Contrary to defendant's contentions, the allegations of tailoring were all specific, not generic, as they related to

perceived inconsistencies between his trial testimony and his pre-trial statements. While defendant maintains there were no true inconsistencies, at the very least, his trial testimony was not consistent with his pre-trial statements and the prosecutor was permitted to cross-examine him about those differences. Accordingly, any accusations of tailoring were specific rather than generic, and hence not improper. Furthermore, it does not violate <u>Daniels</u> to question a defendant about tailoring his testimony to the pre-trial discovery.

V.

In point III of his counselled brief, defendant contends the court improperly refused to sanitize his prior convictions for weapons possession offenses under <u>State v. Brunson</u>, 132 <u>N.J.</u> 377 (1993). In <u>Brunson</u>, the Court modified its ruling in <u>State v. Sands</u>,[5] holding that

> in those cases in which a testifying defendant previously has been convicted of a crime that is the same or similar to the offense charged, the State may introduce evidence of the defendant's prior conviction limited to the degree of the crime and the date of the offense but excluding any evidence of the specific crime of which defendant was convicted. That method of impeachment will insure that a prior offender does not appear to the jury as a citizen of unassailable veracity and simultaneously will protect a defendant against the risk of impermissible use by the

---

[5] 76 <u>N.J.</u> 127 (1978).

45

> jury of prior-conviction evidence. The balance struck adequately vindicates the State's interest in using the prior conviction to cast doubt on the defendant's credibility without subjecting defendant to the extraordinary prejudice that follows if the prior crime was specifically named or described.
>
> [Brunson, supra, 132 N.J. at 391-92 (citation omitted).]

When the convictions are dissimilar, they may be admitted without limitation. Id. at 394. A court, however, has discretion to consider sanitization of prior convictions in any circumstance that poses a risk of undue prejudice to the defendant. State v. Hamilton, 193 N.J. 255, 269 (2008).

Under Brunson, supra, 132 N.J. at 391-93, evidence of defendant's prior weapons convictions should have been sanitized because they were similar to the weapons offenses he faced in the present case, and the evidence should have been limited to the degree of the crimes and the date of the offenses. The court's determination at the Sands hearing, that defendant's weapons convictions did not need to be sanitized because they were not too remote, was erroneous.

Nonetheless, we need not reverse on this basis. First, defendant cannot show that the jury impermissibly used his prior weapons possession convictions as evidence he had a propensity to commit such offenses. Indeed, the jury acquitted defendant of all

46

weapons offenses.

Second, evidence of a defendant's prior weapons possession convictions was admissible without sanitization under the "opening the door doctrine." See Isko v. Planning Bd. of Twp. of Livingston, 51 N.J. 162, 175 (1968) (affirming an order or judgment on appeal if it is correct, even though the judge gave the wrong or different reasons for it). "The 'opening the door doctrine' is essentially a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection." State v. James, 144 N.J. 538, 554 (1996). It "allows a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence." Ibid. It "operates to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context." Ibid. Our Supreme Court has emphasized that the opening the door doctrine can be used only "to prevent prejudice," and may not "be subverted into a rule for [the] injection of prejudice." State v. Vandeweaghe, 177 N.J. 229, 238 (2003) (citations omitted).

47

During cross-examination of several State witnesses, defense counsel elicited testimony that they had never seen defendant with a weapon. During his direct testimony, defendant stated he: hated gangs; was not into robbery and had never robbed anybody; never threatened anybody; was not a "tough guy;" and was afraid of Lewis and the South Side Cartel. That testimony was prejudicial to the prosecution, as it suggested defendant had never carried a gun.

Thus, the testimony elicited by defendant stating or suggesting that he had never carried a gun opened the door for the State to demonstrate he had carried a weapon in the past. Regardless of its propriety, defendant was not prejudiced by the admission of the unsanitized evidence because he was acquitted of the weapons possession offenses.

## VI.

Defendant's remaining claims of prosecutorial misconduct and cumulative error, as set forth in Points I(A), (B), (C), (F), (G) and III of his pro se supplemental brief, lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). Accordingly, we conclude by addressing the sentencing arguments raised in Point IV of his counselled brief. Specifically, defendant contends his sentence is excessive, that the court engaged in impermissible "double counting," and that the court should have found mitigating factor four (N.J.S.A. 2C:44-1(b)(4):

"There were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense[.]").

Our review of sentencing determinations is limited. <u>State v. Roth</u>, 95 <u>N.J.</u> 334, 364-65 (1984). We will not ordinarily disturb a sentence imposed that is not manifestly excessive or unduly punitive, does not constitute an abuse of discretion, and does not shock the judicial conscience. <u>State v. O'Donnell</u>, 117 <u>N.J.</u> 210, 215-16, 220 (1989). In sentencing, the trial court "first must identify any relevant aggravating and mitigating factors set forth in <u>N.J.S.A.</u> 2C:44-1(a) and (b) that apply to the case." <u>State v. Case</u>, 220 <u>N.J.</u> 49, 64 (2014). The court must then "determine which factors are supported by a preponderance of [the] evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." <u>O'Donnell</u>, <u>supra</u>, 117 <u>N.J.</u> at 215. We are "bound to affirm a sentence, even if [we] would have arrived at a different result, as long as the trial court properly identifie[d] and balance[d] aggravating and mitigating factors that [were] supported by competent credible evidence in the record." <u>Ibid.</u>

In sentencing defendant, the judge found four aggravating factors, namely, factor one (<u>N.J.S.A.</u> 2C:44-1(a)(1): "The nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially

heinous, cruel, or depraved manner"); two (N.J.S.A. 2C:44-1(a)(2):
"The gravity and seriousness of harm inflicted on the victim,
including whether or not the defendant knew or reasonably should
have known that the victim of the offense was particularly
vulnerable or incapable of resistance due to advanced age, ill-
health, or extreme youth, or was for any other reason substantially
incapable of exercising normal physical or mental power of
resistance"); three (N.J.S.A. 2C:44-1(a)(3): "The risk that the
defendant will commit another offense"); and nine (N.J.S.A. 2C:44-
1(a)(9): "The need for deterring the defendant and others from
violating the law").

In finding aggravating factors one and two applied, the judge
explained:

> I make those findings based upon the nature
> of the case and the defendant's role in it.
> Even if [] defendant's role was merely to act
> as the lure, to get Miss Worthy into this
> thing, that act, that involvement was the
> linchpin that brought everything together.
> The gravity of the harm inflicted upon [her].
> There are two predicate offenses for which []
> defendant was convicted that could form the
> basis for the felony murder, both the
> kidnapping and the second degree robbery. In
> either case, the sense of betrayal that Miss
> Worthy must have felt when Mr. Bond lured her
> into that in and of itself can be considered
> an aggravating factor. The fact that her body
> . . . [and] her car w[ere] burned in an effort
> to try to destroy evidence exhibits the
> heinous nature of all the actors in this case,
> and . . . I'm bound by the jury verdict.

> There's no special verdict in this case that says the jury found that they were satisfied that this was duress on this count or that count.

The judge did not find any mitigating factors. He specifically found mitigating factor four was not appropriate, stating: "The fact that a defense had been interposed and, according to [defense counsel], the jury verdict was based upon that in part but ignored in part, I don't think that that forms the basis for that mitigating factor." As a result, the judge determined that "the aggravating factors significantly and substantially outweigh [the] nonexistent mitigating factors."

Defendant's argument as to mitigating factor four is not persuasive. The court considered defendant's duress argument at sentencing and rejected it, just as the jury did.

We conclude, however, that the sentencing court improperly considered the arson in finding aggravating factor one. Defendant was acquitted of arson. Nevertheless, the court determined that the arson "exhibit[ed] the heinous nature of all the actors in this case," including defendant. Because defendant was acquitted of arson, the court should not have considered that evidence against defendant in applying aggravating factor one. See State v. Rogers, 236 N.J. Super. 378, 387 (App. Div. 1989) ("Although a defendant may be vicariously accountable for the crimes his

accomplice commits, he is not vicariously accountable for aggravating factors that are not personal to him."), aff'd, 124 N.J. 113 (1991).

Additionally, it appears that the court engaged in prohibited "double counting" by considering "the gravity and seriousness of harm inflicted on the victim" as an aggravating factor. Prohibited "double counting" occurs when the court considers one of the required elements of the offense charged as an aggravating factor. See State v. Yarbough, 100 N.J. 627, 633 (1985) (finding facts that the Legislature has incorporated into the Code as part of the original grading of the offense are not to be weighed as aggravating and mitigating factors to arrive at the appropriate sentence), cert. denied, 475 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986).

"It is well-settled that where the death of any individual is an element of the offense, that fact cannot be used as an aggravating factor for sentencing purposes." State v. Carey, 168 N.J. 413, 425 (2001). Thus, because defendant was convicted of felony-murder, "the gravity and seriousness of harm" inflicted on the victim should not have been considered in determining the aggravating factors. Id. at 426. Since the court erred in finding aggravating factor two, we remand for reconsideration of defendant's sentence in the absence of that aggravating factor.

Defendant's conviction is affirmed. We remand for the court to resentence defendant without consideration of aggravating factor two or the arson, and to correct the JOC to reflect defendant's conviction for second-degree robbery on count two of the indictment.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2317-14T3