**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4142-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMES ROYAL, a/k/a
JAMES ROYAL JR,

     Defendant-Appellant.

_____

     Submitted October 16, 2025 – Decided November 26, 2025

     Before Judges Smith and Jablonski.

     On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 04-02-0180.

     Jennifer N. Sellitti, Public Defender, attorney for appellant (David J. Reich, Designated Counsel, on the brief).

     Matthew J. Platkin, Attorney General, attorney for respondent (Regina M. Oberholzer, Deputy Attorney General, of counsel and on the brief).

Appellant filed a supplemental brief on appellant's behalf.

PER CURIAM

Defendant James Royal appeals from a March 18, 2024 Law Division order denying what he characterized as a motion to reduce his sentence. The trial court found that his motion was effectively a third petition for post-conviction relief (PCR). The PCR court rejected the application as time barred, upholding defendant's 2009 sentence for murder, kidnapping, and other crimes. We conclude defendant's motion fails as a motion to reduce sentence and as a third PCR, and we affirm.

I.

A.

Defendant was charged with a twelve-count indictment related to two incidents that occurred on January 16, 2003, and January 17, 2003. The first incident involved the kidnapping of F.F., and the second incident involved the murder of F.F. and N.F.[1]

After a ten-day trial, a 2009 jury convicted defendant of: second-degree kidnapping, N.J.S.A. 2C:13-1b(2); second-degree possession of a weapon for an

---

[1] We use initials to protect the privacy of the victims pursuant to Rule 1:38-3(c)(12).

A-4142-23

unlawful purpose, N.J.S.A. 2C:39-4(a); third-degree terroristic threats, N.J.S.A. 2C:12-3(a); first-degree murder of F.F., N.J.S.A. 2C:11-3(a)(1) to (2); first-degree murder of N.F., N.J.S.A. 2C:11-3(a)(1) to (2); second-degree burglary, N.J.S.A. 2C:18-2(b); and third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b). We affirmed defendant's convictions and sentence on direct appeal. State v. Royal (Royal I), No. A-3432-09 (App. Div. July 7, 2014). We recount the facts from our opinion:

> Trial commenced with the testimony of [S.G.], the mother of [F.F.] and [N.F.] She described the stormy relationship between defendant and . . . [F.F.], who at the time of her death was a seventeen-year-old high school senior and mother of defendant's son. [F.F.] and [N.F.], who was nineteen, and their respective sons lived with [S.G.]. [S.G.] testified that defendant did not live with them, did not have a key to the home, and was not allowed to enter without permission.
>
> . . . .
>
> [S.G.] testified that on Christmas Day 2002, defendant, who was twenty-years old, proposed marriage to [F.F.]. In early January, in front of [N.F.], [S.G.] and [T.B.], [F.F.] refused the offer by giving defendant a letter.
>
> . . . .
>
> According to [S.G.], after reading the letter, defendant threw it on the table and left the house.

3

Robert Steven, the head of security for the Bridgeton Board of Education, testified that on the morning of January 16, 2003, he saw [F.F.] in front of the high school as she exited a vehicle driven by an African American male. [Barbara] Rainear, who knew [F.F.] well, was on duty as a security guard at the high school and saw [F.F.] arrive "just about hysterical," sobbing and as if she were "in flight." She told Rainear that defendant "took [her] off the bus stop, and . . . said he was going to kill [her]." Defendant "grabbed [F.F.] by the neck" and drove to a nearby park. He had a gun and knife with him and "showed [F.F.] a bullet with [her] name on it." According to [F.F.], defendant was distraught, wanted her to kill him, and told [F.F.], "[I]f you don't kill me[,] I'm going to kill you."

. . . .

Mary Anne Burke managed the supermarket where [F.F.] worked. On the afternoon of January 16, accompanied by [T.B.], [F.F.] went to the store and told Burke she would not be able to work that evening. Burke described [F.F.] as being "very shaky" because of something that had happened to her earlier that day, and the left side of her face looked discolored and "quite swollen."

School was cancelled on January 17 due to inclement weather. [S.G.] called her daughters between 11:00 a.m. and noon and learned that [T.B.] was with them. [T.B.] testified that at approximately 2:00 p.m., [N.F.] unlocked the front door in anticipation of [S.G.'s] return from work. At 2:05, the phone rang and [T.B.] answered it. It was defendant; she gave the phone to [F.F.].

[T.B.] was doing [F.F.'s] hair, so she remained in the room while [F.F.] conversed with defendant. She

4

heard [F.F.] tell defendant, "yes, no, and I don't know." After approximately five minutes, [F.F.] hung up and told [T.B.] that defendant had asked her "about the events from the day before, if the cops knew what happened, if they were looking for him, if he was supposed to go to jail and what was supposed to happen to him."

Fifteen minutes later, while in the kitchen washing her hands, [T.B.] heard [N.F.] yell to her sister, "tell him to get out. I'm going to call the cops." [T.B.] turned and saw defendant standing in front of [F.F.] in the dining room. [T.B.] saw that defendant had a gun when he lifted his sweatshirt.

[T.B.] heard [N.F.] again implore her sister to tell defendant to leave, or she would call the police. [T.B.] heard [N.F.] place the 9-1-1 call. [N.F.] told [T.B.] to take her son out of the house, so [T.B.] "grabbed" the child and "headed for the back door." She heard two shots as she left. [T.B.] ran towards her home, three or four houses away, and heard another shot when she reached the front steps.

The jury heard a recording of the 9-1-1 call and was provided with a transcript that included the following:

> Female Caller ([N.F.] . . .): We have an emergency in here. We've got an emergency in here. This young man has a f[***]ing gun . . . and my son is in here.
>
> . . . .
>
> Female voice in background ([F.F.] . . .): (screaming.)

A-4142-23

. . . .

Female voice in background ([F.F.] . . .):
Oh my god.

Male voice in background (James Royal):
It's a gun.  You know that.  Huh?  You see
what you did to me.

Background:  (Two shots fired.) (Female
voice screaming.)

Male voice in background (James Royal):
Huh?  You see what you did to me.

. . . .

Look at me.  Look at me.  My life's over.  I
loved you.

. . . .

Look at me.  You did this.

. . . .

Female voice in background ([F.F.] . . .):
No it's not.  No it's not.

Male voice in background (James Royal):
My life is over.

Female voice in background ([F.F.] . . .):
No it's not.  Listen to me.

. . . .

A-4142-23

No. . . No . . . No. . . . June . . . June don't do this. Don't this. [sic] (Indiscernable)

. . . .

Don't . . . June . . . June stop.

[T.B.'s] cousin, Dave Smith, lived with her and testified that she was "hysterical" when she arrived home. [T.B.] told Smith that "her girlfriend's boyfriend [had entered] [S.G.'s] house with a gun." As he walked toward [S.G.'s] residence, Smith dialed 9-1-1 and heard a gunshot.

Police arrived at [S.G.'s] home shortly after Smith's call. Inside, they found [F.F.] and defendant on the kitchen floor, and [N.F.'s] dead body in the laundry room. Although [F.F.] was initially responsive, she soon lost consciousness and expired. Defendant was bleeding from his abdomen and told one of the officers, "I've been shot. I've been shot." The officer observed powder burns and residue on the sweatshirt defendant was wearing and surmised that the gun had been fired at close range. Paramedics attended to defendant before he was transported from the scene. A bullet was lodged in his abdomen. Police later found defendant's mother's car parked on a nearby street.

From the kitchen floor, investigators recovered a nine-millimeter, semi-automatic handgun that contained two live rounds and a spent casing that had failed to eject from the chamber. They also found three spent casings; one on the dining room table had [F.F.'s nickname] scratched on the surface. Police also recovered three bullets from the scene. No bullets were recovered from the victims' bodies during autopsy.

7

A-4142-23

The State called Wilmer King, a teacher who had provided defendant home instruction in 2000, and her daughter, Sheri, as witnesses. Defendant had been staying with them in the days preceding the shooting. Both women testified that defendant appeared normal during his stay and did not appear depressed or suicidal; both were shocked when they heard of the shooting. Sheri met with defendant several times after the shooting, and he never mentioned that he had intended to commit suicide on January 17.

The conclusions drawn from the autopsies of [F.F.] and [N.F.] were that both had been shot from a distance of greater than eighteen inches. [N.F.] was likely bending over when struck by a single shot. [F.F.] had been shot twice, the second shot likely having been fired while she was laying on the floor.

The State's firearms expert, State Police Investigator James Joyce, testified that the casings and bullets found in [S.G.'s] home were fired from the gun recovered at the scene. Joyce opined that the fourth shell failed to eject because the shooter retarded the movement of the slide on the weapon. State Police Sergeant David Gripp, an expert in audio enhancement, described how he enhanced the recording of [N.F.'s] 9-1-1 call. Gripp concluded that the call captured two separate gunshots.

After the State rested, defendant's older sisters testified that they and defendant had unstable childhoods and had often been subjected to abuse and neglect by their parents and their parents' paramours. Both of defendant[']s[] siblings had attempted suicide.

For the moment, it suffices to say that primarily through the testimony of Dr. Jonathan Harold Mack, defendant's expert psychologist, it was the defense

8

contention that defendant was depressed and suicidal after [F.F.] rebuffed his proposal. The homicides were unintended, in the sense that defendant planned to kill himself, and the gun went off accidentally when [N.F.] attempted to grab the weapon.

[Royal I, slip op. at 6-14.]

On direct appeal defendant argued that the trial judge failed to consider the Yarbough[2] factors before imposing his consecutive sentences, thus making them "manifestly excessive." Id. at 38. We disagreed, finding "although the judge did not provide a lengthy explanation of his reasons, we cannot conclude that he mistakenly exercised his discretion by imposing consecutive sentences . . . ." Id. at 40.

After we affirmed defendant's convictions and sentence, defendant filed a PCR petition, alleging ineffective assistance of counsel, newly discovered evidence, prosecutorial misconduct, and perjury by certain witnesses. State v. Royal (Royal II), No. A-2737-16 (App. Div. April 10, 2018) (slip op. at 4-5). The PCR court rejected those claims, and we affirmed. Id. at 9.

Defendant filed a second PCR petition, again alleging his trial counsel was ineffective and that his first PCR counsel was ineffective. In 2022, the

_____

[2] State v. Yarbough, 110 N.J. 627 (1985).

A-4142-23

second PCR court denied this petition as time-barred under Rules 3:22-4(b) and 3:22-12(a)(2). Defendant did not appeal from this order.

B.

In 2023, defendant filed a motion to reduce his sentence under the guidelines set forth in State v. Torres, 246 N.J. 246 (2021). Defendant argued his 2009 sentence was illegal because the trial court imposed a sentence in contravention of Yarbough and Torres. The trial court denied the motion, treating the application as a third PCR. The court found this third PCR was time-barred under Rules 3:22-4(b) and 3:22-12(a)(2). On appeal, defendant argues:

> I. THE COURT ERRED IN HOLDING THAT ROYAL'S ILLEGAL SENTENCE CLAIM WAS PROCEDURALLY BARRED BECAUSE SUCH A CLAIM MAY BE ASSERTED AT ANY TIME.
>
> II. CONCERN ABOUT APPLYING STATE V. TORRES RETROACTIVELY IS UNWARRANTED BECAUSE TORRES DID NOT CREATE A NEW RULE OF LAW.
>
> III. ROYAL MUST BE RESENTENCED TO COMPLY WITH THE COURT'S MANDATE IN STATE V. TORRES REQUIRING A SENTENCING COURT TO CONSIDER THE OVERALL FAIRNESS OF THE SENTENCE.
>
> IV. THE COURT SHOULD VIEW ROYAL AS HE IS AT THE TIME OF RESENTENCING.

A-4142-23

II.

This PCR appeal poses questions of law, which we review de novo. State v. Hernandez-Peralta, 261 N.J. 231, 246 (2025) (citing State v. Harris, 181 N.J. 391, 419 (2004)). Defendant argues that the trial court erred by considering his application as a petition for PCR. Instead, defendant contends that his application should be considered a motion to reduce his sentence. We conclude that defendant's claims lack merit under either theory.

A.

We begin with a review of defendant's illegal sentence claim. To the extent defendant argues that his consecutive sentences were improper under Yarbough, that claim fails. Defendant raised this argument on direct appeal and was unsuccessful. Royal I, slip op. at 39-40. Because defendant's consecutive sentence claim was previously addressed, it is barred. R. 3:22-5.

Defendant also argues that Torres calls for a vacation of his 2009 sentence and a remand for resentencing so that the overall fairness of his sentence can be considered. We are unpersuaded, as Torres does not apply retroactively to PCR matters.

When deciding whether a case will be applied retroactively, the underlying question is "whether it 'announced' 'a new rule of law.'" State v.

11

G.E.P., 243 N.J. 362, 382 (2020) (quoting State v. Feal, 194 N.J. 293, 307 (2008)). "A new rule of law is announced 'if there is a sudden and generally unanticipated repudiation of a long-standing practice.'" Ibid. (quoting Feal, 194 N.J. at 308) (internal quotation marks omitted). "When a decision does not constitute a new rule, however, the retroactivity analysis ends." State v. Bull, 227 N.J. 555, 561 (2017) (citing Feal, 194 N.J. at 308).

Here defendant was sentenced in 2009, twelve years before Torres was decided. The Torres court emphasized its desire to "promote" the "concepts of uniformity, predictability, and proportionality" that underpin the Yarbough factors. In its opinion, the Supreme Court stated:

> We reiterate the repeated instruction that a sentencing court's decision whether to impose consecutive sentences should retain focus on the "fairness of the overall sentence." State v. Miller, 108 N.J. 112, 122 (1987); see also State v. Abdullah, 184 N.J. 497, 515 (2005). Toward that end, the sentencing court's explanation of an evaluation of the fairness of the overall sentence is "a necessary feature in any Yarbough analysis." State v. Cuff, 239 N.J. 321, 352 (2019).
>
> [Torres, 246 N.J at 270 (citations reformatted).]

Torres simply stressed the well-settled requirement that a sentencing court must supply "an explanation of the overall fairness of [a] consecutive sentence." Ibid. Torres did not create a new rule of law requiring retroactive application.

We conclude that the absence of a <u>Torres</u> statement does not render defendant's 2009 sentence illegal.

## B.

We briefly turn to whether defendant's current application before the trial court could be considered a third petition for PCR. To the extent that it can be labeled as such, we conclude this theory fails as well.

Under <u>Rule</u> 3:22-4(b), a second or subsequent PCR petition must be dismissed unless it falls within the applicable time limit under <u>Rule</u> 3:22-12(a)(2) and it alleges on its face one of the three available grounds for relief. <u>Rule</u> 3:22-12(a)(2) instructs us that second and subsequent PCR petitions cannot be filed a year later than the latest of:

> (A) the date on which the constitutional right asserted was initially recognized by the United States Supreme Court or the Supreme Court of New Jersey, if that right has been newly recognized by either of those Courts and made retroactive by either of those Courts to cases on collateral review; or
>
> (B) the date on which the factual predicate for the relief sought was discovered, if that factual predicate could not have been discovered earlier through the exercise of reasonable diligence; or
>
> (C) the date of the denial of the first or subsequent application for post-conviction relief where ineffective assistance of counsel that represented the defendant on

the first or subsequent application for post-conviction relief is being alleged.

Under Rule 3:22-4(b)(2)(A), a permissible ground for relief on a second or subsequent PCR petition must allege:

> that the petition relies on a new rule of constitutional law, made retroactive to defendant's petition by the United States Supreme Court or the Supreme Court of New Jersey, that was unavailable during the pendency of any prior proceedings . . . .

Recognizing that his motion to reduce his sentence could be interpreted as a PCR petition, defendant argued before the trial court that the patently clear one-year time bar on his subsequent PCR petition should be relaxed under State v. Hannah, 248 N.J. 148, 190 (2021). The Hannah Court concluded a time bar does not prevent a court from reviewing ineffective assistance of counsel (IAC) claims in determining whether defendant was "denied a fair trial," or "whether [the] conviction constitute[d] a fundamental injustice." Id. at 177-78. Here, we previously held on defendant's direct appeal that defendant was not denied a fair trial. See Royal I, slip op. at 32. Also, we already concluded that defendant failed to establish an IAC case. See Royal II, slip op. at 6-9. We cannot conclude that Hannah compels us to relax the time bar and review defendant's PCR claim. A plain reading of the Court Rules leads us to easily conclude that the one-year time limit for a second or subsequent PCR petition controls on this

14

record.  <u>R.</u> 3:22-12(b).  We therefore arrive at the same conclusion as the trial court.  If defendant's motion is interpreted as a third PCR petition it is time barred.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-4142-23